## DALLAS WASTE MILLS v. EARLY-FOSTER CO. (No. 6106.)

(Court of Civil Appeals of Texas. Austin. Dec. 3, 1919. Rehearing Denied Feb. 11, 1920.)

1. CONTRACTS ⬳145—MADE WHERE ACCEPTANCE OF OFFER IS GIVEN.

A contract is made where the acceptance of the offer is given.

2. CORPORATIONS ⬳503(2) — ACTION FOR BREACH OF CONTRACT MAY BE BROUGHT IN COUNTY WHERE CONTRACT WAS MADE; "PART OF CAUSE OF ACTION."

Within Vernon's Sayles' Ann. Civ. St. 1914, art. 1830, subd. 24, authorizing suit against a private corporation in the county in which the cause of action, "or a part thereof arose," the making of a contract constitutes part of the cause of action in suit for its breach.

3. EVIDENCE ⬳457—AMBIGUOUS PROVISIONS OF CONTRACT MAY BE EXPLAINED.

Testimony is admissible as to the meaning of provisions of a written contract of sale of linters, they being ambiguous, in the sense that their meaning is not clear to one not familiar with the preparation of and dealing in cotton seed mill products.

4. SALES ⬳177—BUYER ENTITLED TO STAND ON PROVISION OF CONTRACT AS TO PLACE OF DELIVERY.

The purchaser of goods is not required to accept delivery of them at a place other than provided in the contract, and limit damages to the difference in cost of shipping from the two places, but may stand on his contract, and recover as though the seller had refused to make any delivery.

5. SALES ⬳418(7) — BUYER MAY NOT BUY FROM ITSELF ON NONDELIVERY BY SELLER AND HOLD SELLER FOR DIFFERENCE IN PRICE.

A buyer cannot, on failure of the seller to deliver, buy other goods of itself, trading under another name, and hold the seller for the difference between the price paid and the contract price.

6. APPEAL AND ERROR ⬳854(2) — JUDGMENT AUTHORIZED BY PLEADING AND EVIDENCE NOT REVERSED BECAUSE OF WRONG THEORY.

Judgment for plaintiff, though on a wrong theory of measure of damages, will not be reversed; the petition authorizing recovery on the proper the , and the evidence showing plaintiff entitled to an amount equal to the judgment.

7. SALES ⬳418(6) — COMMON-LAW REMEDY NOT EXCLUDED BY RIGHT GIVEN BY CONTRACT IN CASE OF NONDELIVERY.

Provision of contract of sale giving purchaser, in case of nondelivery, right to buy other goods in the open market and hold the seller for the difference between the contract price and the price paid, not being mandatory, does not furnish the exclusive remedy, but the buyer may have his common-law remedy of recovering the difference between the contract price and the price at which he could have sold the goods.

Appeal from District Court, McLennan County; H. M. Richey, Judge.

Action by the Early-Foster Company against the Dallas Waste Mills. Judgment for plaintiff, and defendant appeals. Affirmed.

C. M. Smithdeal, of Dallas, for appellant.
Sanford & Harris, of Waco, for appellee.

KEY, C. J. Early-Foster Company, a private corporation, brought this suit against Dallas Waste Mills, another private corporation, and recovered a judgment for $1,181.68, for an alleged breach of a contract; and the defendant has appealed.

The contract was in writing, and read as follows:

"Ft. Worth, Texas, Feb. 29, 1916.

"Contract No. 1148.

"Early-Foster Co., Waco, Texas, Buyers.
"Dallas Waste Mills, Dallas, Texas, Sellers.

"Gentlemen: Referring to 'phone conversations and exchange of telegrams to-day between Mr. Foster of the Early-Foster Co., Waco, Texas, and Mr. Glarner of the Dallas Waste Mills, Dallas, Texas, and ourselves:

"We beg to confirm having this day sold to Early-Foster Co., Waco, Texas, for account of the Dallas Waste Mills, millrun Linters made from sound cotton seed and free from damage,

at the price of five dollars eighty-two and one-half cents ($5.82½) per hundred pounds f. o. b. cars Texas Common Point Mills.

"Shipment: Immediate.

"Terms: Demand draft with B/L attached.

"Routing: Buyers' option.

"This contract is made in triplicate, one copy being sent to each buyer and seller and the original retained in our office on file, which has been duly stamped.

"This sale is made subject to the Rules of the Texas Cotton Seed Crushers' Ass'n.

"Commission: Twenty-five cents (25¢) per bale to be paid by the seller, payable at Fort Worth, Texas.

"Yours truly,     Kyser-Ruble Brokerage Co.,
                    "Per [Signed] C. R. Ruble.
"CRR/LH              (As Brokers Only)."

The plaintiff, whose place of business was in Waco, McLennan county, Tex., accepted the terms of the contract at that place, as they had previously done by telephone. A rule of the Texas Cotton Seed Crushers' Association prescribes that all trades in cotton seed products may be for either immediate, prompt, or specified dates of shipment, and that the word "immediate," as therein used, means within five working days. Another rule of that association reads as follows:

"Should a buyer fail to give shipping instructions for linters or to receive them when shipped in accordance with the terms of the contract, the seller may after 48 hours' notice to the buyer cancel the contract or sell the linters in dispute through a recognized broker for the buyer's account, and any loss sustained will be a valid claim against the buyer. Conversely, a buyer may protect himself in case of nondelivery of linters bought."

W. M. Foster, who was president and general manager of Early-Foster Company, testified, among other things:

"The matter in controversy here is covered by a written contract dated February 29, 1916, covered a purchase by Early-Foster Company of 250 bales of linters from the Dallas Waste Mills. I handled this transaction for Early-Foster Company. As to what is meant in the contract by 'demand draft with B/L attached,' I will say there was to be a draft drawn on demand payable upon presentation, not at sight, but a demand draft with bill of lading attached sent to Waco, and we were to pay it on presentation. It was a cash item. The draft was to be paid in Waco, in McLennan county. As to what is a 'bill of lading,' will say we had a shipment of 250 bales of linters. They secured a bill of lading from the railroad company for 250 bales of linters, attached the same to the draft and forwarded same to Waco to be paid. They would obtain that bill of lading from the railroad company whenever they had the linters loaded in the cars, and the agent then signed it. The Dallas Waste Mills would draw the draft. By 'draft' I mean an ordinary customers' draft drawn through the banks. The draft would reach Waco through the banks in the ordinary course of bank collection. The contract has this language in it: 'This sale is made subject to the rules of the Texas Cotton Seed Crushers' Association.' The Texas Cotton Seed Crushers' Association is an association gotten up by the millmen, brokers, and dealers, where we all get together and formulate and make rules to trade under. It existed in the state of Texas, and is at present in existence with headquarters at Dallas. They had theretofore promulgated certain rules which were the rules we traded under and the rules referred to in this contract. There is another provision in the contract which reads: 'We beg to confirm having this day sold to Early-Foster Co. for account Dallas Waste Mills, Dallas, Texas, 250 bales clean millrun linters made from sound seed and free from damage, at the price of $5.82½ per hundred pounds f. o. b. cars Texas Common Point Mills.' As to what is meant by the word 'mills,' I will say it is the mill that produces or manufactures linters. The letters 'f. o. b.' mean free on board railroad cars. 'Texas Common Point Mills' is a term that is applied—meaning the same freight rate would apply to Chicago or points that are shipped to from Texas points where the same rate applies. As to what is meant by a common point on railroads, I will say that is a point where the rate is the same as a number of points or a certain territory—in groups you might 'call it. Texas common point rates would protect within the radius of Waco north, Temple north to say 150 miles. That would be the same rate of freight to New Orleans or Memphis or to Chicago or to Kansas City. I mean the same rate of freight would apply from any of those points, say, to New Orleans, Chicago, Memphis, etc. Those calculations are commonly known in the railroad world and the business world. Waco in McLennan county at that time was such a common point. When I use the word 'mill,' that means a mill located at one of these common points. We could not force them to deliver f. o. b. a common point where there was no mill. That means a mill located at one of these Texas common points on the railroad. I did not ever actually receive from the Dallas Waste Mills any of the cotton linters under this contract. I did rely on the Dallas Waste Mills to deliver said linters within the five days provided in the contract and under the rules. We did go into the market and buy 250 bales of cotton linters on March 6, 1918. We bought the 250 bales from the Waco Cotton Linters Company and paid therefor 6¾ cents per pound f. o. b. Texas common mill point. About 27,000 pounds is what we received. You say I have it 27,755; I think that is correct. We had a customer to whom we had sold the linters and expected to deliver them these linters; that is what we bought them for. We bought these linters from the Waco Cotton Linters Company for the purpose of filling our contract."

It was also shown by Mr. Foster's testimony that on March 3, 1916, the defendant tendered to plaintiff delivery of 250 bales of linters, at Galveston, Tex., and drew a draft on the plaintiff for the contract price, not with bill of lading attached, but with warehouse receipts attached. Mr. Foster testified that there was no cotton seed mill at Galveston, and that it was not a common point or shipping place within the terms of the contract. So, the

plaintiff declined to accept the linters at Galveston, refused to pay the draft referred to, and in due time notified the defendant that it would buy in other linters and hold the defendant responsible for the difference in market price. Mr. Foster testified that the course referred to was pursued; that-he placed the matter in the hands of Kyser-Ruble Company, brokers; and that they purchased for the plaintiff 250 bales of linters, at the prevailing market price, which was 6¾ cents per pound. He also stated that the brokers bought the linters referred to from the Waco Cotton Linters Company, which was owned by the plaintiff, Early-Foster Company. In other words, he stated that the plaintiff did business under two names, one being Early-Foster Company, and the other being the Waco Cotton Linters Company, and he admitted, on cross-examination, that they bought the linters from themselves.

The trial was without a jury, and no conclusions of law and facts were filed.

[1, 2] The defendant filed a ·plea of privilege to be sued in Dallas county, and the first assignment of error complains of the action of the trial court in overruling that plea. Subdivision 24 of article 1830, Vernon's Sayles' Texas Civil Statutes, prescribes that suits against any private corporation, association, or joint-stock company may be maintained in the county in which the cause of action, or a part thereof, arose, etc. The original contract in this case was made by telephone. The defendant, through its agent, the brokers, made an offer to the plaintiff at its place of business, in Waco, McLennan county, and the plaintiff accepted that offer at that place; and the same may be said in reference to the written contract. A contract is made where the acceptance of an offer is given. Ins. Co. v. Harris, 94 Tex. 25, 57 S. W. 635, 86 Am. St. Rep. 813; Cuero Cotton Oil Mfg. Co. v. Feeders' Supply Co., 203 S. W. 79, and authorities there cited. So it follows that the contract involved in this case was made in McLennan county, where the suit was brought. But it does not follow that this conferred jurisdiction upon the courts of McLennan county, unless it be that the making of the contract constituted, in part, the cause of action sued upon. The plaintiff sued for a breach of that contract, and, if the making of the contract constituted part of the plaintiff's cause of action, then the cause of action arose, in part, in the county where the suit was brought. That precise question was presented to and decided by our Supreme Court, in Western Wool Com. Co. v. Hart, 20 S. W. 131. The opinion in that case was written by Judge Hobby, of the Commission of Appeals, and was adopted by the Supreme Court; and as it seems never to have been officially reported, and as it contains an illuminative and satisfactory discussion of the

question referred to; we make the following extended quotation from it:

"The Act of March 20, 1848, 'organizing justices' courts, and defining their powers and jurisdictions' (Pasch. Dig. p. 285), provided that no person shall be sued before any justice of the peace, except in the precinct of his residence, or in the precinct where the cause of action accrued, if in the same county (Pasch. Dig. art. 1188). No corresponding provision is made in the 'Act to regulate proceedings in the district court,' of 1846 (Pasch. Dig. p. 346, art. 1423). In 1874 an act was passed to 'fix the venue in certain cases,' which provided substantially that public or private corporations, created by the laws of this or any other state, may be sued in any court in this state, having jurisdiction of the subject-matter, in any county 'where the cause of action, or a part thereof, accrued.' Gen. Laws 1874, p. 31. Subdivision 21, art. 1198, of the Revised Statutes, adopted in 1879, provided that suits against a private corporation, etc., might be commenced in any county in which the cause of action, or a part thereof, arose, etc. Such is the law as it now stands. The jurisdiction in this case rests upon the fact whether 'the cause of action, or a part thereof, arose' in Howard county, Tex. The cause of action is that in which the plaintiff's remedy has its origin, the fact or facts giving him the right to bring the suit. In cases like the present—a suit for damages growing out of the alleged breach of a contract—the cause of action must be predicated on some right existing in the plaintiff, and some duty resting on the defendant towards the plaintiff by reason of that right, which duty the defendant has failed to perform, or has negligently performed. The facts showing the defendant's failure to perform this duty constitute what we term the breach of the contract, and are no more a part of the cause of action than those facts· which entitle the plaintiff to its performance. In other words, those facts which show the plaintiff's primary right in the matter are as much a part of the cause of action, and are as necessary as a foundation for the suit, as are those facts showing a violation or invasion of his right, ordinarily termed a breach of the contract or covenant by the defendant. Every cause of action, it is said by Mr. Pomeroy, consists, when subjected to analysis, of two separate and distinct elements, the primary right and duty of the parties respectively, and the wrongful act or omission violating it. Our statute (section 21, art. 1198) seems to recognize the fact that the cause of action consists of two distinct elements, as it provides that the jurisdiction of the court shall attach where 'a part thereof arose.'

"The proof certainly shows that the transactions between appellant's agent and appellee in Howard county, with reference to the shipment of the wool to appellant at St. Louis, formed a part of the cause of action (without these facts, which the proof disclosed, plaintiff showed no right of recovery); and it is difficult to understand the meaning of the language giving jurisdiction 'where a part thereof arose' if it was not intended to embrace a case like the present. This language last quoted was· not in the law prior to 1874. It was incorporated in the law in 1874, the language being 'where the cause of action, or a part thereof, accrued.'

Since 1879 the law has given jurisdiction to the county 'where the cause of action or a part thereof arose.' In the case of Phillio v. Blythe, 12 Tex. 127, under the law defining the jurisdiction of justices' courts, which provided that suit might be brought. in the precinct 'where the cause of action accrued,' etc. (Pasch. Dig. p. 285), it was decided that where the defendant contracted in one precinct with the plaintiff to build a house for him in another, and there was a breach of the contract by defendant in the latter, the cause of action for the recovery of the price accrued in the precinct where the house was to be built, or the breach was committed. In the case cited the plaintiff sought to recover on the ground that 'the cause of action accrued' in precinct No. 1. He failed to do so because it was shown that, while a 'part of the' cause of action,' as this term has been defined, 'arose' in that precinct, it 'accrued' in precinct No. 2. There was, then, no law authorizing a recovery by the plaintiff on the ground that a part of the cause of action arose in any locality. In discussing the question in the case cited, the court say: 'When, under the common law, it was required that juries should be drawn from the immediate neighborhood in which the cause of action had arisen, it was found extremely difficult in mixed transactions, which happened partly in one place and partly in another, * * * to determine where the cause of action did accrue. * * * The same difficulties now exist in ascertaining the place of a cause of action, and it is a misfortune that the Legislature, in expressing the exceptions, did not employ perspicuous terms,' etc. The difficulty mentioned has been removed by the language giving jurisdiction where the cause of action arose, or a part of it arose, which the Legislature has incorporated in the law since the case of Phillio v. Blythe, supra. That case is plainly distinguishable from the present. In that case the recovery was sought in precinct No. 1, on the ground that 'the cause of action accrued' there. It evidently accrued, as in this case, where the breach was committed, and that was, in the case cited, in the second precinct, where the contract was to be performed. But in the case under consideration the plaintiff seeks a recovery on the ground that 'a part of the cause of action arose' in Howard county, Tex. That a part of it arose in that county is manifest, because, if the facts (the dealings and transactions between plaintiff and Robinson, appellant's agent in Howard county) be eliminated from this controversy, plaintiff could not recover. That part of the cause of action which arose in that county is so essential to the existence of the cause of action as a whole that there would be none without it. It has been held that, where 'the cause of action, to be within the jurisdiction of the court, must have arisen within its territorial jurisdiction, the phrase means the whole cause of action.' This necessarily includes every fact material to be proved to entitle the plaintiff to succeed, and every fact the defendant would have a right to deny. 3 Amer. & Eng. Enc. Law, p. 46, note 1. It was doubtless one of the purposes of the Legislature to authorize the plaintiff to sue in those counties where 'a part of the cause of action arose' against corporations, and not to restrict him to the vigorous requirement that every fact necessary to constitute the whole cause of action should occur in a county to give jurisdiction."

The same point was also decided the same way by the Ft. Worth Court of Civil Appeals, in Cuero Cotton Oil Mfg. Co. v. Feeders' Supply Co.; supra. Hence we overrule the first assignment, and hold that the trial court ruled correctly on the plea of privilege. We rest our decision upon that point solely upon the ground that the plaintiff's cause of action arose in part in the county where the suit was brought, and not upon any other ground.

[3] By several assignments of error, appellant contends that the trial court committed error in permitting the witness Foster to testify concerning the meaning of certain provisions of the written contract. Some, if not all, of the provisions referred to, are ambiguous, in the sense that their meaning is not clear to any one who is not familiar with the preparation of and dealing in cotton seed mill products. However, some of his testimony, for instance that defining what was meant by the letters "f. o. b.," was immaterial. Hence we overrule the assignment referred to.

[4-7] We also overrule appellant's contention that, if the plaintiff was entitled to recover, the measure of damage would be the difference in the cost of shipping the linters from Galveston, and what would have been the cost if they had been delivered at a point covered by the contract. We overrule that contention. The plaintiff had the right to stand on its contract, and it does not lie in the mouth of the defendant to say that, although it breached the contract, if the plaintiff had waived its right to have performance thereof in accordance with the contract, the amount of damage would have been lessened. However, we sustain appellant's contention presented by its eleventh assignment of error, to the effect that the plaintiff could not buy other linters from itself, and hold appellant responsible because of the fact that the linters so bought cost more than the contract price. But that ruling does not require a reversal of the case. The plaintiff's testimony shows that linters of the class contracted for had increased in value to such an extent that, if appellant had complied with its contract, the plaintiff would have sold the linters at a profit equal to the amount of the judgment which was rendered against it. In other words, while the provision in the contract may have authorized the plaintiff to purchase other linters in the open market and hold the defendant liable for the difference between the contract price and the price paid for such other linters, that provision is not mandatory, and does not limit the parties to the remedy thereby conferred. Therefore, conceding that the plaintiff did not comply with that provision of the contract, still its petition was so framed as to entitle it to its common-law remedy, which was the differ-

ence in the contract price and the price for which plaintiff could have sold the linters; and the plaintiff submitted testimony which will sustain the judgment upon that theory.

Hence we conclude that no reversible error has been shown, and that the judgment should be affirmed, and it is so ordered.

Affirmed.