**SECURITY BANKING & INVESTMENT CO. et al. v. FLANAGAN. (No. 2531.)**

(Court of Civil Appeals of Texas. Texarkana. April 21, 1922. Rehearing Denied May 4, 1922.)

1. **Evidence** ⊛═213(1)—Offers to compromise not admissible as admissions of liability.

Offers to compromise disputed claims are not admissible as admissions of liability.

2. **Appeal and error** ⊛═1050(1)—Error in admission of offers of compromise harmless on subsequent testimony as to similar concessions of liability.

In a well driller's action for stipulated damages, for delays in drilling caused by his employers' failure to furnish equipment and materials as agreed, error, if any, in permitting plaintiff to testify as to defendants' offers to pay certain sums for "shut-down" time, was rendered harmless by defendants' subsequent testimony as to similar concessions of liability if such they were, though such testimony concerned a different transaction, where no particular delays were mentioned for which specific damages were claimed.

3. **Trial** ⊛═352(4, 5)—Interrogatory as to whether plaintiff's failure to perform was caused by defendants' wrongful acts held not erroneous, as failing to submit real issue and assuming defendants guilty of such acts.

In a well driller's action for breaches of contract, rendering it impossible to complete the drilling to the contract depth, an interrogatory as to whether plaintiff's failure to drill to such depth was due to defendants' wrongful acts, in violation of the contract as alleged in the petition, was not erroneous, as failing to submit the real issue or assuming that defendants

⊛═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

were guilty of wrongful acts, the effect thereof being merely to ask if plaintiff's failure to drill was caused by the alleged wrongful acts.

**4. Trial ⟨⟩232(5)—Instruction as to meaning of phrase, exempting from liability for delays caused by anything beyond control of the party charged, held not erroneous.**

In a well driller's action for damages for delays caused by his employers' failure to furnish equipment and materials, as required by the contract, which provided for stipulated damages for delays due to other causes than strikes, riots, etc., "or anything beyond the control of" defendants, an instruction that such phrase must be restricted to matters of the same kind or character as the matters therein referred to, *held* not too restrictive, the jury not being told that only the conditions specifically named would excuse nonperformance by defendants, and no mention being made of any other conditions that would or would not excuse them.

**5. Contracts ⟨⟩156—Mines and minerals ⟨⟩109—Well-drilling contract construed under ejusdem generis rule.**

Under a well-drilling contract, providing for stipulated damages to the driller for delays "within the control of" the employers, but that such provision should not be applicable in event of strikes, riots, etc., "or anything beyond the control of" the employers, the exculpatory conditions under the former phrase must be of the same kind and character as those specifically enumerated in the latter, which, to give effect to all the language used, should be considered not as necessarily excluding every imaginable condition not within the employers' physical control, but as explanatory of and a guide in determining the character and kind of conditions which should exempt them from doing the things essential to the prosecution of the work.

**6. Contracts ⟨⟩155—Ambiguities construed against writer.**

Mere ambiguities in a contract should be construed most favorably for the party who did not write it when possible without violating the evident intention of the parties.

**7. Contracts ⟨⟩346(9)—Admission of evidence excusing breach of contract held erroneous, where matters in avoidance were not pleaded.**

In a well driller's action for breach of a drilling contract providing for stipulated damages for failure to furnish equipment and materials as agreed, where defendants answered only by general denials and countercharges, without pleading anything in avoidance of their failures, they were erroneously permitted to prove the congested condition of railway traffic, while the drilling was going on, and diligence in promptly supplying the tools and material called for by plaintiff during such time.

**8. Pleading ⟨⟩130—Fact relied on as a defense, not included in averments necessary to support plaintiff's case, must be pleaded in answer.**

A fact relied on as a defense, which is not included in the averments necessary to support plaintiff's case, must be set out in defendants' answer.

**9. Judgment ⟨⟩248—Evidence of facts not pleaded, though admitted without objection, cannot form basis of judgment.**

Evidence of facts not pleaded, though admitted without objection, cannot form the basis of a judgment.

**10. Appeal and error ⟨⟩1062(1)—Submission of special issue as to custom, between which and contract requirements no conflict was alleged or proved, held not prejudicial.**

In a well driller's action for breach of a contract providing for stipulated damages for delays caused by the employers' failure to furnish equipment and materials as agreed, where plaintiff did not allege or offer evidence of any custom requiring defendants to do more than the contract provided, the submission of a special issue as to whether plaintiff was compelled to shut down because of defendants' failure to do or furnish anything which, according to the general custom then prevailing, should have been done or furnished, was not prejudicial to defendants.

### On Motion for Rehearing.

**11. Mines and minerals ⟨⟩109—Instruction not to allow stipulated damages for period of delay in performance of contract caused by other party properly refused, though part of time was covered by other items.**

In a well driller's action for breach of a contract, providing for stipulated damages for delays caused by the employer's failure to furnish equipment and materials as agreed, the court properly refused to instruct the jury to allow no damages for a delay of 42 days in fighting a wet hole caused by inferior casing furnished by defendants, though a part of such time was covered by other items in plaintiff's list, as some portion thereof might properly form the basis of a recovery.

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Action by G. E. Flanagan against the Security Banking & Investment Company and others. Judgment for plaintiff, and defendants appeal. Affirmed.

Bradley, Burns, Christian & Bradley, of Fort Worth, for appellants.

R. S. Garrett Goree, Odell & Allen, and Ernest May, all of Fort Worth, for appellee.

HODGES, J. On the 29th day of April, 1919, the appellee, Flanagan, entered into a written contract with the appellant Security Banking & Investment Company, an unincorporated association, to complete the drilling of a well in Jones county, Tex. The well was at the time 620 feet deep, and the appellee was to drill it, if necessary, to the depth of 3,000 feet and to receive as compensation therefor the sum of $7 per foot. This suit was later instituted by him against the Security Banking & Investment Company, and

---

⟨⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

H. L. Houghton, H. E. Trowbridge, and F. C. Shoemaker, as trustees of the company. The suit is based upon the alleged breach of the written contract above referred to.

The contract provided that the appellants were to furnish certain equipment and material to be used in the drilling operations. It contains, among others, this clause:

"It is further provided that, if the party of the second part (Flanagan) should discover a paying sand, that the party of the first part (Security Banking & Investment Company) will pay to the party of the second part the sum of $10 per foot while drilling in and through said sand; it being further understood that, if the said party of the second part shall be delayed in the drilling of said well on account of the failure of the party of the first part to carry out their part of this contract, that for such delays, which are the necessary cause and within the control of the said parties of the first part, the said party of the second part is to receive the sum of $100 per day; provided however, that the last above provision shall not be applicable in event of strikes, insurrections, riots, acts of Providence, martial law, or anything beyond the control of the said parties of the first part. It being understood between the parties hereto that the party of the second part is to do all of his own underreaming, the party of the first part to furnish the underreamer."

It was alleged by the appellee that, about May 1, 1919, he entered upon the discharge of his duties under the contract and drilled about 2,205 feet; that, when that depth was reached, the appellants wrongfully discharged him and forcibly compelled him to abandon the premises, thus rendering it impossible for him to complete the well to a depth of 3,000 feet. He claims, under the terms of the contract of $7 per foot, that he is entitled to $15,405. He also alleges that, on account of the failure of the appellants to furnish water, fuel, suitable rigging, and tools, and, on account of the defective casing, he was delayed 151 days. These items are set out in a statement attached to his petition. He alleges that, on account of such delays, he is entitled to the further sum of $15,100, under the provisions of the contract allowing him $100 per day. He further alleges that, if he had been permitted to complete the well, he would have been entitled to $1,225 additional, and this could have been done at a cost of $550. He admits the payment of $6,400 by the appellants upon their contract. He asks judgment for the aggregate sum of $30,659 and for the foreclosure of the lien on the leasehold, oil well, rig, tools, casing, and other equipment.

The appellants answered generally and specially, putting in issue the grounds of liability contained in the appellee's petition.

The case was submitted on special issues, and a verdict returned in which the jury found, in substance, that the failure of the appellee to drill the well to the depth of 3,000 feet was caused by the wrongful acts of the appellants, committed in violation of their contract; that the appellee did not voluntarily abandon his contract, and that he was delayed 86½ days by reason of the failure of the appellants to perform their contract duties, and that he was entitled to the stipulated damages for that time. The court rendered a judgment in favor of the appellee against the appellants the Security Banking & Investment Company, and against each of the trustees jointly and severally, for the aggregate sum of $18,703.97.

Most of the questions raised in this appeal relate to the claim of the appellee for damages resulting from what the parties call "shut down time," that is, damages resulting from delays in the prosecution of the drilling operations, for which the appellants were held responsible. The appellee alleged that he had lost 151 days, and the jury found that he had lost 86½ days, because of the failure of the appellants to comply with the terms of their contract. The fact that the delays complained of occurred is not here contested, but appellants deny that those delays resulted from the failure of the appellants to comply with the terms of their contract.

While the appellee was on the stand, he was permitted to testify as follows, over the objection of the appellants:

"I didn't have any understanding with him [F. C. Shoemaker] about finances or paying me some money; I could not get any satisfaction out of him, or get the boys down here and get this matter straightened up; I wanted him to give me money enough to pay off the tool dressers; I was having trouble with the tool dressers; they wanted their money so I could go ahead and get some of this shut down time and go ahead. I never finally came to any understanding with him [Shoemaker]. He wanted me to take $1,500 for my shut time, and I refused to do it. Finally he came to $2,000, and I told him, 'Nothing doing.' Then he said, 'I can't settle with him;' and he says to Mr. Houghton, 'You settle with him.' He says, 'I can't.' He wanted me to take $1,500 for my shut down time, and I refused to do so. Mr. Houghton and I came to terms in a little bit, and he went and saw Mr. Shoemaker, and Mr. Shoemaker refused to come through. Mr. Houghton was his associate there in business. So he finally offered me $2,000, and I says, 'There's nothing doing,' and I caught the train and came back home."

The appellants objected to that testimony upon the ground that it related to an offer of compromise made by them to the appellee in settlement of his claim of damages for "shut down" time. The objection was overruled, and that ruling is assigned as error.

[1, 2] It is well established that concessions made as offers to compromise and settle disputed claims cannot be introduced in evidence for the purpose of showing as admission of liability on the part of the debtor. The record does not, in this instance, dis-

close the existence of any previously pending controversy concerning this demand for "shut down" time. The pleadings of the appellee, which set out a claim for damages resulting from those delays, were composed of a number of distinct items. These consisted of different delays, occurring at different times and caused by differing conditions. It did not appear that, at the time this conversation between the appellee and Shoemaker took place, the latter denied all liability whatever on that account. Prior to that time Flanagan had, according to his own testimony, sent in bills for such delays, but these were ignored. On that occasion he was insisting on the payment of $5,000. Whether or not that was all he then claimed is not shown. No particular item seems to have been in dispute. Shoemaker's offer of $2,000 was rejected apparently because it was not sufficient to meet appellee's entire demand, not because it eliminated any particular item. The offensive testimony was harmful to the appellants only as tending to show as admission by Shoemaker of some liability on the claim for "shut down" time. Assuming that such a result might have made the admission of the evidence reversible error, subsequent proceedings show that the appellants condoned the offense by voluntarily offering testimony to the same effect. At a later stage in the trial, the appellants' witness Houghton testified, on his direct examination, as follows:

"I had a conversation with Mr. Flanagan about his claiming shut down time. I don't remember just when that was. It was during that week that the three men were in; that was early in January, I believe. I explained to Mr. Flanagan that he was not entitled to any shut down time. The conversation was on the $3,000. He wanted $5,000, and we had offered him $3,000. The conversation wasn't on shut down time; it was on the $3,000; and he said, 'I know according to the clause in that contract I can't claim it under the contract, but it is the custom.' He went on to tell me about the different oil men who would swear it was the custom, and I said, 'It doesn't make any difference whether it is the custom; you are not entitled to it under this contract. But we are under heavy expense; we want to get that well finished; we want to go on and finish the well.' I was trying to persuade him to take $3,000."

Similar testimony from Shoemaker was also admitted without objection. It thus appears that, so far as any objection upon the ground that the testimony complained of tended to show a concession of liability, that objection was waived by the voluntary introduction of the testimony of Houghton and Shoemaker, in which both witnesses admitted making the same or similar concession. While the appellants contend that those witnesses were testifying about a different transaction, that fact is immaterial, for the reason that one transaction is as much a

concession of general liability as the other. Since no particular delays were mentioned for which specific damages were claimed, the legal effect of the testimony of Flanagan was not different from that of Houghton and Shoemaker. Hence the error, if any, was rendered harmless.

The first, second, and third interrogatories submitted by the court and the answers made, are as follows:

"Question No. 1. Was the failure of the plaintiff to drill the well in controversy to a depth of 3,000 feet due to and caused by the wrongful acts of the defendants, in violation of the contract in controversy as alleged in plaintiff's petition? Answer. Yes.

"Question 2. Was it necessary that the plaintiff in the drilling of said well should shut down the drilling of same on account of the failure of defendants to furnish anything which, in the written contract entered into between plaintiff and defendant, they should have furnished, or by the failure of defendant to do anything which it was provided in said contract that they should do, or by the failure of the defendants to do or furnish anything which was within the contemplation of the parties at the time of making said contract that the defendant should do or furnish, or the failure to do any act or furnish anything which, according to the general custom then prevailing, they should have done or furnished? Answer. Yes.

"Question 3. How many days, if any, was the plaintiff compelled to stop drilling by reason of any or all of the matters specified in above issue No. 2? Answer. 86½.

"You are instructed that, in answering questions Nos. 2 and 3 that you will not consider delay, if any, occasioned by strikes, insurrections, riots, acts of Providence, martial law, or anything beyond the control of defendants, as provided against in the contract in controversy in this case. In this connection you are instructed that the phrase 'anything beyond the control of defendants,' as used in said contract, is to be construed in connection with the other provisions in said contract, and the specific terms with which it is associated and connected will control the meaning of such phrase. That is, this phrase must be restricted to those things or matters which are of the same kind or character as the other matters therein referred to, such as strikes, insurrections, riots, acts of Providence, and martial law. You are further instructed that, by the term 'acts of Providence' as used in said contract, is meant circumstances and conditions produced by physical causes which are irresistible and such as could not have been reasonably foreseen or overcome by the exercise of reasonable care, prudence, and diligence, upon the part of defendants.

"Question 4. Did the plaintiff voluntarily abandon his contract with the defendant? Answer. No."

[3] The first question is objected to because it fails to submit the real issue in controversy, and further, as being on the weight of the evidence in assuming that the appellants were guilty of wrongful acts. The objection is untenable. While the question

might, with propriety have been couched in different language, yet it did submit the real issue. The form used meant no more than to ask the jury if the failure of the appellee to drill the well to the contract depth was caused by the acts, alleged to be wrongful, in the appellee's petition. This instrument the jury had with them during their deliberations. Those averments were not of facts so complicated, numerous or confusing as to mislead the jury or to cause the rendition of an improper answer. Upon that issue one of the appellants testified:

"So I just went out to Merkel the next morning and made him [appellee] a final proposition out on the ground, and when he would not take it I told him to come off there; but in the meantime I had talked with this fellow Gree and Lowden [Flanagan's drillers] and I said, 'You fellows have no business working on this well; Flanagan owes you money, you have got a big fishing job on, and in view of the fact that you boys can't get your money, I want to know if you want to go back on the well, and I will pay you $12 per day.'"

Other interrogatories propounded and answered make it plain that the jury were not impressed with any assumption on the part of the court that the appellants had been guilty of the wrongful conduct alleged.

[4] Objection is made to that portion of the charge wherein the court undertook to explain the meaning of the phrase "anything beyond the control of the party of the first part." It is argued that the contract as written was a plain, unambiguous statement of the intention of the parties, did not require any construction by the court, and that the interpretation given was too restrictive, in limiting the jury in their consideration of the conditions relied upon to excuse the appellants from the nonperformance of the terms of their contract. Under that agreement the appellee was to furnish the labor and skill, and drill the well to a certain depth. The appellants were to furnish the rig, casing, fuel, and water, together with the tools and to pay a stated sum per foot drilled. In order to protect the appellee from expensive delays resulting from the failure of the appellants to promptly supply the equipment and material required, it was stipulated—

"that, if the said party of the second part (Flanagan) shall be delayed in the drilling of said well on account of the failure of the party of the first part to carry out their part of this contract, that for such delays, which are the necessary cause and within the control of the said parties of the first part, the said party of the second part is to receive the sum of $100 per day, provided, however, that the last above provision shall not be applicable in event of strikes, insurrections, riots, acts of Providence, martial law, or anything beyond the control of said parties of the first part."

[5, 6] The court did not tell the jury, in the explanatory charge, that only the condi-

tions specifically named would exempt the appellants from the performance of their duties under the contract; nor did he mention any other conditions that would or would not excuse them. He merely told the jury that the exculpatory conditions must be of the same kind and character as those which the parties had named. This was but the application of the well-known rule of ejusdem generis, so frequently adopted as a means of arriving at the real intention of the parties, when the language they have used is not entirely clear. See 6 Ruling Case Law, pp. 842, 843. Counsel for appellants concede that the rule applied is correct in ascertaining what the parties meant by the words "anything beyond the control of the said parties of the first part," which follows the particulars enumerated. But they deny that those particulars should control the meaning of the language "such delays as are the necessary cause and within the control of the said parties of the first part," which precedes the stipulation for the damages. To say that the appellants shall be liable for delays within their control and shall not be liable for delays beyond their control, are, in legal effect, but different ways of stating the same conditions of immunity. If the statement first appearing in the contract, the last above quoted, is so definite as to necessarily exclude every imaginable condition not within the physical control of the appellants, then the subsequent enumeration of specific things, and the general expression which followed these, were meaningless surplusage and should be rejected as such. On the other hand, it does no violence to the evident intention of the parties to say that the last phrase, containing the enumerated conditions, should be considered as explanatory and a guide in determining the character and kind of conditions which should be regarded as exempting the appellants from doing the things essential to the prosecution of the work in which both parties were interested. In that way only can effect be given to all the language they used. Shoemaker, one of the appellants, wrote the contract, and for that reason mere ambiguities should be construed most favorably for the other contracting party, when this can be done without violating the evident intention of the parties.

The principal cases relied on by the appellants are those in which the courts were discussing whether or not the contracts then under consideration should be so construed as to limit the controlling conditions or things to those expressly enumerated in the instruments. No such a case is presented in this controversy. Here the court, after giving the abstract rule complained of, left it to the jury to determine whether or not the facts relied on by the appellants were legally sufficient to excuse them for a fail-

ure to perform the duties which they had undertaken.

[7] In their answer the appellants met the charges, setting up violations of their contract in failing to promptly furnish needed equipment and material only by denials general in their nature and by countercharges that the appellee willfully and without cause shut down and ceased work at times when he had all the tools and material the appellants were to supply. In other words, they merely put in issue the failure on their part to perform the contract according to its terms, without attempting to plead anything in avoidance of such failures. Notwithstanding that defect in their pleadings, the appellants were permitted, without any apparent restriction, to prove the congested condition of railway traffic generally in and about the city of Fort Worth during the year 1919 and while the drilling operations were going on. They were also permitted to prove diligence on their part in promptly supplying all the tools and material called for by the appellee during that time. There was nothing in the explanatory provision of the court's charge which prevented the jury from considering those conditions as legally sufficient to excuse the appellants from the consequences of their failure to meet the obligations which they had assumed.

[8] Under the terms of this agreement, the appellants bound themselves to supply certain things, and the provision under consideration was the specification of conditions under which they might be excused for not meeting their obligation. If they relied upon that provision as a defense, it devolved upon them to allege and prove the existence of conditions which would legally excuse their nonperformance. When the defendant intends to rest his defense upon a fact which is not included in the averments necessary to the support of the plaintiff's case, he must set it out in his answer. Coburn v. Travelers' Ins. Co., 145 Mass. 226, 13 N. E. 604; San Jacinto Oil Co. v. Texas Oil Co., 47 Tex. Civ. App. 477, 105 S. W. 1163.

[9] Another legal proposition, equally as well settled, is that evidence of facts not pleaded, although admitted without objection cannot form the basis of a judgment. Harvey v. Cummings, 68 Tex. 599, 5 S. W. 513; Banking Co. v. Stone, 49 Tex. 4; Town's Texas Pleading (2d Ed.) p. 426. The only way appellants attempted to meet that requirement was in the manner above stated. It is but fair to say, in that connection, that the evidence upon which they relied was of such a general nature that the jury was amply justified in treating it as inadequate to discharge the burden which rested upon appellants. We therefore conclude that there was no error in the portion of the charge complained of under that assignment.

[10] Appellants also objected to that portion of the second special issue in which the court asked the jury if the plaintiff was compelled to shut down on account of the failure of the appellants to do any act or furnish anything which, according to the general custom then prevailing, they should have done or furnished. The evidence did not show any controversy between the parties growing out of any conflict between custom and the things specified in the written contract. Neither in his pleadings nor in his testimony did the appellee resort to custom in order to require the appellants to do more than was clearly embraced within the terms of the writing.

There are other assignments, all of which have been considered. They are overruled without discussion, because to notice them in detail would be a useless consumption of time.

The judgment is affirmed.

### On Motion for a Rehearing.

[11] Among the items listed by the appellee as the basis of his claim for delay was one for 42 days, from September 28, 1919, "fighting a wet hole caused by defendants furnishing plaintiff casing of inferior grade and not heavy enough to withstand the water pressure and which became broken and permitted water to seep into the hole." In the trial, appellants presented a special charge directing the jury not to allow the appellee any damages for delay during the period covered by that item. That charge was refused, and the ruling was assigned as error. In the motion for a rehearing, it is urgently insisted that there was neither pleading nor evidence to sustain a finding in favor of the appellee upon that item. It is true the appellee testified that a part of the time included in that 42 days was covered by other items included in his list. He frankly admitted that, about 12 days of that period, was covered by other items and improperly included in that particular one. He did testify, however, that a portion of that time was not covered by other items of his claim, and contended that the delay was occasioned by the failure of the appellants to furnish proper material for use in his operations. In view of the fact that some portion of that time might properly form the basis of a recovery for delay, the court correctly refused to give the charge requesting the jury to disregard the entire period.

We have carefully examined the remaining grounds set out in the motion for a rehearing, and conclude that they are not sufficient to justify a reversal of the judgment.

The motion is overruled.