**UNITED SALES COMPANY, Appellant,**

v.

**CURTIS PEANUT CO., Inc., Appellee.**

No. 15226.

Court of Civil Appeals of Texas.

Dallas.

March 22, 1957.

Rehearing Denied May 31, 1957.

Bradford & Pritchard, Dallas, for appellant.

Woodrow Curtis, Pearsall, and John Peace, San Antonio, for appellee.

YOUNG, Justice.

Appellant's action as plaintiff in trial court against Curtis Peanut Company, Inc., sought recovery for shortages in two shipments of peanuts made by it to plaintiff, amounting to $2,705.13, which shipments the latter had paid for prior to delivery, and for its lost profits of $22,977.75 on the remaining portion of peanuts not delivered by defendant pursuant to its contract to deliver thirteen carloads. An appeal relating to venue of the cause is reported in 283 S.W.2d 113, and in the interest of brevity reference thereto is made for a detail of material facts. Defendant admitted in open court to liability for shortages in shipments made; and upon jury trial and answers to special issues, judgment was rendered for plaintiff in that amount only ($2,705.13); denying any relief on its remaining cause of action (damages growing out of failure to deliver balance of shipments under contract), which becomes the subject matter of this appeal.

Fact issues presented and resolved by the jury should first be summarized: (1) That on or about October 26, 1954 United Sales Company had sold the undelivered portion of said peanuts (9½ rail cars) to another purchaser; (2) so sold by plaintiff were 480,600 lbs. of peanuts; (3) plaintiff was to receive therefor $116,094; (4) that because of adverse weather conditions and drought during the year of 1954 it was impossible for defendant to make delivery of the remaining portion of said thirteen cars of peanuts to the plaintiff; (5) plaintiff failed and refused to pay, upon presentation, the sight draft, bill of lading attached, drawn by defendant for payment of the third carload of peanuts; (6) plaintiff had requested permission of defendant to inspect said car of peanuts prior to payment of sight draft; (7) defendant had refused plaintiff permission to inspect such third rail car of peanuts prior to payment of said draft; (8) plaintiff was ready and willing to pay said draft before defendant caused same to be returned to it.

The parties were members of the Southwestern Peanut Shellers Association; the transaction being governed by printed rules of the Association which in part provided: Section 4.15, art. IV, "Deliveries under contracts are subject to delays or cancellation on account of strikes, fire, explosions, storms, destruction incident to war, and other causes beyond the control of the seller." Section 5.3 art. V, "Each car of Shelled Peanuts, Farmers' Stock Peanuts and other Peanut Products bought or sold under these rules shall be treated and handled throughout as a separate purchase

or sale, regardless of the number of cars or the time of shipment stipulated in any given contract. * * *" Sec. 9.4, art. IX, "When either party to a contract feels that the other has breached the same by failing to furnish shipping instructions, failing to pay for goods, failing to make shipments or to replace rejected shipments, or by failing otherwise to comply with the terms of a contract the following rules shall govern: (I) The complaining party may, not sooner than 24 hours or later than 48 hours (Sundays and holidays not included) after filing telegraphic notice to the other party, confirmed by letter, stating his intentions to do so: (a) Cancel the contract. (b) Buy (or sell as the case may be) for the account of the other party the goods covered by that part of the contract under dispute, for shipment conforming as nearly as possible to the original contract. (c) The purchase (or sale) shall be made through a recognized peanut broker. The broker's negotiations with and confirmation to the third party shall not mention the name of the party complained of, or distinguish the transaction in any way. (d) However, the broker shall immediately notify, by wire, confirmed by special written memorandum, both parties to the original contract. (e) Instructions of the complaining party to the broker shall be by telegraph, confirmed in writing, stating the name of the party for whose account the purchase (or sale) is being made, for the purpose of distinguishing the same from other ordinary transactions which might possibly be in the process of consummation concurrently. (II) After taking into consideration any necessary expenses incurred under Section I, of this rule, the complaining party shall be entitled to recover from the other party any loss incurred as compared with the original contract terms, and conversely shall account to the other party for profit that may have been similarly realized."

Further material testimony was to the following effect: That the sight draft, bill of lading attached, for the third car of peanuts of 50,000 lbs., mentioned in issues 5, 6, 7 and 8, was not paid immediately and on following day the shipment was canceled by defendant with order to the Bank for return of draft (plaintiff's official testifying in such connection that the delay was incident to a determination of whether such carload was in transit; also that later the second day he had offered to pay the draft at Bank but was told that same had been withdrawn); that the total peanuts delivered was 169,400 lbs.; that defendant was obligated to deliver the balance of 480,600 lbs. to plaintiff at 19⅜¢ per lb., or a total price of $93,116.25; plaintiff then selling said part of contract (9½ cars) to E. B. Johnson, Inc.,—150,000 lbs. at 24½¢ per lb. and 330,600 lbs. at 24¢ per lb., a total of $116,094; Mr. Johnson testifying that the transaction was conditioned on delivery by Curtis Peanut Company.

Defense to plaintiff's claim of breach of contract and lost profits was twofold: first, that defendant was absolved perforce of the quoted proviso 4.5, Association Rules, and as reflected in the affirmative answer to issue 4 that delivery of the remaining cars of peanuts could not be made because the anticipated crop of peanuts on date of contract, September 7, 1954, was affected by the continuation of drought and adverse weather conditions to the extent that such peanut crop was reduced to a yield so small as to render impossible the full performance of such contract; and secondly, defendant in amended answer, after allegations to effect that plaintiff had violated Association rules in payment of previous sight drafts, then charged "That because of the continuous additional cost to this defendant of the failure of the plaintiff to pay such sight drafts as per the contract and as such sight drafts were presented to the plaintiff's bank as per plaintiff's instructions defendant had no other alternative but to rescind the said contract because of the continuous breach of the contract by the plaintiff." Plaintiff had moved for judgment on the jury ver-

dict, and in the alternative for judgment regardless of their answer to issue 4; in other words, that adverse weather condition or drought was not a contingency excusing performance of contract within purview of sec. 4.15 allowing cancellation on account of strikes, fire, explosion, storm, destruction incident to war, and *other causes beyond the control of the seller*. Points of appeal are too lengthy for inclusion here but argue liability of defendant for lost profits on above ground as a matter of law and also in fact, on basis of testimony of Curtis, defendant's own President.

It is well settled law in Texas that impossibility of performance arising after the contract is made is not an excuse for nonperformance where it might reasonably have been anticipated or foreseen and guarded against in the contract, and though it results from an act of God or some circumstance over which the parties have no control; 10 Tex.Jur., p. 434; Levy Plumbing Co. v. Standard Sanitary Co., Tex.Civ.App., 68 S.W.2d 273 (writ ref.). "In order that impossibility may excuse performance in any case, it must appear that it was a physical impossibility for the party to perform. It is not enough to show merely that because of events oc-

curring since the making of the contract it has become impossible to obtain a commodity contracted for from a source contemplated by the parties, where the contract does not specify that the commodity is to be obtained there, even though it would have been more expensive to obtain it elsewhere." 10 Tex.Jur., p. 435. Annotation 51 A.L.R. p. 995; Security Banking & Investment Co. v. Flanagan, Tex.Civ.App., 241 S.W. 702, modified on other grounds, Tex.Com.App., 254 S.W. 761; Garner & Co. v. Beaumont Cotton Oil Mill Co., Tex. Civ.App., 212 S.W. 690. Defendant was not excused on account of a crop shortage, because such contingency is not specifically mentioned in Rule 4.15 and one not naturally falling within the class of events mentioned for specific exemption under the doctrine of ejusdem generis. Issue 4 and the affirmative answer thereto were therefore immaterial and should have been disregarded. As appellant observes, defendant had pled said shortage was due in part to "the continuation of the drought", impliedly admitting that same was not an unexpected event or one that could not have been reasonably anticipated at the time the contract was made.

Furthermore, under the testimony of Ned Curtis[1] said jury finding No. 4,

---

1. Excerpts from testimony of Ned Curtis:
"Q. Now, Mr. Curtis, in view of the fact that the market went up approximately five cents a pound and you had here 480,600 pounds yet to go on your contract with United Sales Company, that amounts to approximately $23,000.-00, isn't that right? A. Close enough.
"Q. The increase there due to that market price? A. Uh huh. * * * I had an agreement with Mr. A. A. Cary to buy the peanuts over around Giddings, Texas, and had you paid that draft on sight we would have been able to deliver it in full, but after you refused to pay it on sight and then run the garnishee against it that absolutely cut off our credit and threw our contract with Mr. Cary in a very bad light.
"Q. So, this business about not being able to deliver them on account of the weather is not true, is it? A. That is partially so. There is a whole lot to that.

"Q. But you just told us so, that the reason you didn't deliver was the matter of not paying the draft, is that right? A. We couldn't deliver them out of our area.
"Q. But you could have gotten them from Mr. Cary, is that right? A. I don't know whether we could or not. We had a contract but it doesn't mean necessarily it would have been fulfilled because it was dry over there too.
"Q. The peanuts were available for somebody who had money to buy them— A. I don't know whether they were or not.
"Q. Well, you were very positive about the fact that you had a contract at Giddings, Texas? You could have gotten them? A. Well, we could have gotten some. We had a contract with Mr. Cary but whether he could have gotten them out I don't know, and I seriously doubt it.

in so far as it may have indicated an impossibility for defendant to secure said peanuts from any source whatever, is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong; it having pled in such connection "that this defendant anticipated it would in the normal course of business be able to purchase peanuts in this territory or other territories sufficient to deliver the said 13 cars." Manifestly, from the testimony of Curtis, the principal reasons for his cancellation of further shipments were: (1) Appellant's failure to pay sight draft on the third rail car; and (2) the garnishment proceedings incident to appellee's resale of said third car to other parties (subject of defendant's cross-action in the instant suit but stricken by the trial court because not filed "in accordance with the rules of Civil Procedure"). Admittedly defendant had an agreement with A. A. Cary of Giddings, Lee County, to supply peanuts under its contract with plaintiff; Mr. Curtis further testifying that the peanut crop for that year in Texas and Oklahoma amounted to approximately 35,000 tons.

■ Appellee's further claim of right to cancel the entire contract because of alleged failure on part of appellant to promptly take up sight drafts on the cars of peanuts delivered, is obviously met by sec. 5.3, Association Rules, making each car lot bought or sold under the regulations "a separate purchase or sale, regardless of the number or cars or the time of shipment stipulated in any given contract."

■ On this appeal, and for the first time, another defense is raised; namely, that appellant did not follow the procedure required under Section 9.4 above quoted relative to cancellation of contract, that is, United Sales Company did not buy peanuts from other sources and deliver them under the contract to E. B. Johnson, Inc., and then make claim for its damages; and having failed to do so, is not entitled to lost profits. Magnolia Provision Co. v. Coleman, Tex.Com.App., 3 S.W.2d 412, 413, is cited for the assertion that resort to Rule 9.4 is mandatory for any such relief. Here appellant invokes the well established rule that the parties are restricted to the theory on which the case was tried in the court below. "In the exercise by the appellate courts of their jurisdiction as a court of review, they are not authorized to consider a theory of recovery which was not before the trial court and which it was not called upon to decide." 3-A Tex.Jur., Sec. 136, pp. 168–169.

To the merits of said additional point, appellant calls attention to the wording of Rule 9.4 that the complaining party *may* cancel the contract and establish its damages by complying with the provisions therein described; becoming simply a *permissive* method of determining the damages claimed in addition to its common law rights. Similar provisions have been so interpreted by the courts: Planters Oil Co. v. Gresham, Tex.Civ.App., 202 S.W. 145; Dallas Waste Mills v. Early-Foster Co., Tex.Civ.App., 218 S.W. 515. In Magnolia Provision Co. v. Coleman, supra, the

"Q. Well, you just said you could have gotten them if we had paid the draft? A. If you had paid the draft we could have gotten more than we did. * * *
"Q. All right, I will ask you this question: Why did you refuse to comply with the rest of the contract? A. Because we needed the money badly, and it had ample time to pay that draft and refused to do so, and we refused to ship any more because they wouldn't pay them on sight. We had no assurance that they wouldn't pay any of them on sight thereafter.

"Q. Now, was that the second or third time, they refused to pay drafts on sight? A. Yes.
"Q. I believe you testified this was the third time or second— A. Third time, I believe.
"Q. All right. Is that the reason you refused to send any more peanuts under the contract? A. That's right * * * Texas and Oklahoma, or Texas, should have made a hundred thousand tons of peanuts that year—they made only thirty-five thousand tons, approximately a third of a crop * * *."

procedure outlined in the rules there under consideration was expressly made the *exclusive* remedy for the fixing of damages. Above cited cases were referred to with approval by the Commission of Appeals; the Court then stating, "It will be noted the rule, amended since these decisions, changed the word 'may' to 'must,' and by rule 213 expressly stipulated that 'the method of fixing damages for breach of the contract outlined in the foregoing rules are exclusive and a failure to follow the procedure there required will defeat the claim of breach of the contract'." [3 S.W.2d 413.]

In harmony with the conclusions herein reached it becomes our duty to disregard jury finding No. 4 and enter judgment in favor of appellant United Sales Company for its lost profits in amount of $20,665.25 together with undisputed shortages in amount of $2,705.13, or a total recovery of $23,370.38, and costs.

Reversed and rendered.