Paul SMITH, Appellant,

v.

F. E. DYE et al., Appellees.

No. 12931.

Court of Civil Appeals of Texas.

Galveston.

Sept. 27, 1956.

On Filing of Remittitur Oct. 11, 1956.

McGregor & Sewell and William R. Eckhardt, Houston, for appellant.

Joe Entzminger, Bay City, for appellee, Dr. F. E. Dye.

Kemper & Kemper and W. L. Kemper, Houston, for appellee, Bulk Barites, Inc.

HAMBLEN, Chief Justice.

This is an appeal by Paul Smith from a judgment of the District Court of Matagorda County. Suit was filed by Dr. F. E. Dye as plaintiff against Paul Smith and Bulk Barites, Inc. as defendants for damages to realty and to an office building, including loss of use thereof, allegedly resulting when a tractor and trailer, owned by appellee Bulk Barites, Inc. and being towed along a public street in Bay City, Texas, by a winch truck operated by appellant, Paul Smith, became detached from the winch truck and collided with the building. A cross-action was filed by Bulk Barites, Inc. against Paul Smith for damages to and loss of the use of its truck.

Plaintiff F. E. Dye and cross-plaintiff Bulk Barites, Inc. alleged in their pleadings that the accident was caused by the acts, or omissions, of negligence on the part of defendant Paul Smith; and also in the alternative plead the doctrine of res ipsa loquitur.

Defendant Paul Smith plead unavoidable accident, and also alleged that the vehicles were secured together by agents and employees of Bulk Barites, Inc. and that if any act, or omission, of negligence was committed, which was denied, that it was committed solely by agents or employees of Bulk Barites, Inc. A cross-action was filed by Paul Smith against Bulk Barites, Inc. for indemnity and/or contribution.

Trial was before a jury which, in response to special issues, returned a verdict upon which the court entered judgment against Paul Smith and in favor of F. E. Dye for damages to his building and to his realty and for loss of rental value, and against Paul Smith in favor of Bulk Barites, Inc. for damages to its truck and for loss of use thereof.

Appellant has attacked the judgment in twenty-three formal points of error, which he has grouped for argument under six propositions. In order to understand their significance, it is necessary that the material facts be stated in some detail.

Bulk Barites furnishes a type of mud used in the drilling of oil and gas wells. In connection with this business, the company maintains a plant in Bay City. Jim Evans is employed as manager of this plant. For the purpose of distributing its product to customers in the area, Bulk Barites owns and operates four large trailer trucks especially built for the purpose. These trucks, or in any event the truck involved in this case, were shown to weigh from 26,000 to 40,000 pounds.

Paul Smith owns and operates a repair business in Bay City equipped to do metal welding. Bulk Barites' trucks from time to time were in need of minor repairs, including welding, and that company had, over a course of several years, employed Paul Smith to make them. This course of business had been mutually satisfactory to the extent that Bulk Barites habitually delivered its trucks to Smith for repairs without inquiring in advance as to the price which might be charged, feeling confident, because of past experience, that the work would be satisfactorily done and the price charged would be reasonable.

On the night of August 3, 1953, one of Bulk Barites' trucks, while loaded, became mired on a dirt road some twenty to twenty-five miles out of Bay City. Efforts to remove the truck under its own power resulted in damaging the differential gears. Efforts to remove it by use of another winch truck under the control of Bulk Barites resulted in damage to the winch truck. Between 9:00 and 10:00 p. m. Jim Evans, who had been informed of the difficulties regarding the mired truck, called Paul Smith and asked him to bring his (Paul Smith's) winch truck to the scene and to undertake to free the mired truck. In response to this call, Paul Smith drove his winch truck, described as an F-7 Ford, to the place where the Bulk Barites' truck was mired. He was met there by Jim Evans, who had driven his automobile to the scene, and by Eddy Palmer and C. E. Carroll, who were truck drivers employed by Bulk Barites. By the use of his winch truck, Paul Smith successfully freed the mired truck and thereupon towed it about a mile along the road to a point where it could be unloaded by Bulk Barites' employees into another of its trucks. After the unloading operation, the damaged Bulk Barites truck was attached to Smith's winch truck and towed into Bay City, where the collision giving rise to this litigation occurred.

There is a dispute in the evidence as to the capacity in which Paul Smith performed this towing operation. He had never before performed that type of service for Bulk Barites, and it is his contention that the service was gratuitously performed in consideration of past business relationship and in order that he might do certain welding jobs needed on the truck. Barites contends that he was commercially employed as an independent contractor to perform the towing service.

While Paul Smith was engaged in freeing the Bulk Barites' truck from its mired condition, and thereafter in attaching it to his winch truck preparatory to towing it to Bay City, he was assisted by Bulk Barites' employees. The evidence is disputed as to the manner in which the Bulk Barites' truck was attached to Paul Smith's truck and as to who performed the various operations in connection therewith. It is undisputed that the two truck drivers, particularly C. E.

Carroll, "pitched in" to help. Evans used the headlights of his automobile to light the scene of the operation.

There is also a dispute as to the capacity in which the Bulk Barites' employees performed whatever work they did. Smith contends that they worked as employees of Bulk Barites. The latter contends that they were loaned servants of Paul Smith.

The manner in which the jury resolved these various disputes and the support or lack thereof for the jury findings will be discussed in more detail hereafter.

Paul Smith was alone during the towing operation from a time shortly after its commencement until the time of the collision. He testified that he drove along the road, a part of which was rough, for a distance of twenty to twenty-five miles without incident. During this time he stopped to examine the attachments between his truck and the towed truck at least twice. After entering the limits of Bay City, he stopped in compliance with a traffic signal. Very shortly after putting his truck and tow in motion from this stopped position, while still using one of the low speed gears of his truck and when he had reached a speed of not more than ten miles per hour, he heard a noise which caused him to look back just in time to see the Bulk Barites' Truck rolling free in a diagonal direction across the street. The truck rolled clear of Smith's truck and up onto the property of F. E. Dye, damaging the realty and a brick office building owned by him, the damage to realty consisting of destroying a cedar tree. The reason for the distinction in property characterization between the tree and the building is not disclosed, but is apparently immaterial. Damage was also inflicted to the Bulk Barites' truck. The accident happened about two o'clock in the morning when the street was deserted and the building unoccupied. Smith was unable to give any reason or explanation for its occurrence.

The fact issues raised by the pleadings and the evidence were exhaustively submit-

ted to the jury in seventy-two special issues. We paraphrase the material findings as follows—the numbers indicate the numbers of the issues as shown in the court's charge:

1. Paul Smith failed to use proper tow lines or chains.

2. Such failure proximately caused the collision.

3. Paul Smith had exclusive control and supervision of the securing and tying of the Barites' truck to his truck.

4. Paul Smith failed to properly secure the Barites' truck to his truck.

5. Such failure was negligence.

6. Such failure proximately caused the collision.

11. Paul Smith and the employees of Bulk Barites were acting jointly in securing and tying the Bulk Barites' truck to his truck.

12. Paul Smith and the employees of Bulk Barites failed to properly secure Bulk Barites' truck to his truck.

13. Such failure was negligence.

14. Such failure proximately caused the collision.

20. By negative answer, the jury found that Smith did not fail to keep a proper lookout as to the condition of the tow line.

21. Predicated thereon was not answered.

22. Paul Smith failed to inspect the tow line at regular and proper intervals.

23. Such failure proximately caused the collision.

30. Paul Smith failed to use a safety chain to secure Bulk Barites' truck to his truck.

32. Such failure proximately caused the collision.

33. The facts and circumstances of the occurrence reflect negligence on the part of Paul Smith.

34. Such negligence proximately caused the collision.

37. By negative answer, the jury found that the facts and circumstances of the occurrence did not reflect negligence on the part of Paul Smith and Bulk Barites, Inc.

39. Paul Smith contracted to tow the Bulk Barites' truck for charges to be paid by Bulk Barites.

40. Paul Smith contracted to tow Bulk Barites' truck to Bay City and make repairs thereto.

41. Transporting the Bulk Barites' truck to Bay City was a part of the contract made by Paul Smith.

42. By negative answer, the jury found that the service done by C. E. Carroll in either attaching or assisting in attaching the Bulk Barites' truck to Paul Smith's truck was not done at the request of Paul Smith.

43. The service done by C. E. Carroll in attaching or assisting in attaching the Bulk Barites' truck to the truck of Paul Smith was done as an accommodation to Paul Smith.

44. The service done by C. E. Carroll was done either under the orders or authority of Paul Smith.

45. C. E. Carroll was loaned by Bulk Barites to Paul Smith in order that he might perform such service.

46. The collision was caused solely by acts or omissions of Paul Smith.

47. The collision was caused solely by either insufficiency or inadequacy of towing equipment of Paul Smith.

48. The collision was not the result of an unavoidable accident.

49. Paul Smith failed to tow the Bulk Barites' truck in a careful and prudent manner.

51. Such failure proximately caused the collision.

56. Bulk Barites' truck was secured to Paul Smith's truck by C. E. Carroll.

57. C. E. Carroll participated in securing the trucks together.

58. The jury negatively found that C. E. Carroll was not acting in the course of his employment with Bulk Barites.

The damage issues will be discussed separately.

Appellant's first proposition, in which it is stated that formal points of error Nos. 1, 7, 17, 18, 19 and 23 are germane, is that plaintiff offered and is bound by the uncontradicted testimony of the witnesses Carroll and Head which affirmatively showed that there was no negligent act or omission on the part of Paul Smith which proximately caused the collision, and therefore appellant's motion for an instructed verdict should have been granted.

The witness Carroll has already been mentioned. The witness Head is a night policeman in Bay City. He did not witness the collision but did hear it and came to the scene within a minute after its occurrence. He described the position of the trucks when he arrived, and in the course of his testimony stated, "* * * from all indications I could tell it looked like the truck came loose and I imagine the wheels were set that way whenever it came loose because it bucked off to the right as soon as it hit." Appellant argues that this testimony affirmatively shows that there was no negligent act or omission on the part of Paul Smith proximately causing the collision and that having offered this witness appellee is bound by his testimony. We frankly are unable to see how the quoted testimony, either expressly or by inference, has the probative effect that appellant contends that it has. In the light of the conditions under which the witness observed the vehicles, his testimony is a statement of conclusions which are self-evident. From the standpoint of negligence or causation, we cannot see how it proves anything.

The substance of the testimony of the witness Carroll upon which appellant relies is that he tied the winch lines on the Barites' truck in the usual and customary way of tying them on; that he believed Smith put a chain around the winch line and down to a cross timber on his truck to keep the towed truck from rolling forward onto the towing truck; that he helped Smith until he got the front end of the truck picked up and said it was all right and then he left; that he saw nothing wrong with the way they were hooked together; that he was familiar with the way it should be done and it looked all right to him; that Paul Smith "* * * came back there and I think he kicked it with his foot and I said, 'Paul, what do you think about it?' and he said, 'It looked all right.' I believe that is what he said." That he had heard of lines slipping and coming loose before without any apparent reason; that that can happen very easily even if it is properly put, and that he did not know why this hook-up came loose.

■ We are unable to agree with appellant's contention that Carroll was plaintiff's witness and that his testimony is binding on plaintiff. Under plaintiff's and this appellant's pleadings, Carroll was charged with acts or omissions of negligence proximately causing this collision. We do not think it can be seriously doubted but that a witness so charged is an interested witness in so far as the jury's right to accept or reject his testimony is concerned. Applicable to this situation are the words employed by this Court in Carothers v. Moore, Tex.Civ.App., 183 S.W.2d 987, 989: "No set of facts occurs to us which would justify holding that a witness is a disinterested one where the issue in the case is whether such witness's negligence proximately caused the damages sued for."

■ Aside, however, from the question of whose witness Carroll might be considered to be and who might be bound by his testimony, we are unable to see that it has the completely exonerating effect relative to

appellant's negligence for which appellant contends. According to appellant's testimony, there were three attachments between his winch truck and the Barites' truck; two consisted of the winch line and the tie-down, or snub-chain, mentioned in Carroll's testimony; the third is identified as a safety-chain which connected some portion of the towed truck to the headache rack on the winch truck. From the testimony relative to this chain, it may be inferred that its purpose is to guard against the possibility of the winch line slipping and coming loose, as described by Carroll. The jury was entitled to believe that ordinary prudence would dictate the use of such a safety-chain. There are discrepancies and conflicts in the testimony relative to the use of this chain. Appellant testified that he fastened one end of the chain to the headache rack of the winch truck and tossed the other end to Carroll, who attached it to the Barites' truck; whereupon appellant tightened it with a boomer. Carroll, on the other hand, testified that after the winch line and tie-down chain were attached and the Barites' truck was pulled up on the winch truck until snubbed by the tie-chain, he left. There is testimony to the effect that the safety-chain was seen lying loose on the bed of the winch truck. Appellant testified that it was so situated immediately after the collision. The evidence, though circumstantial in nature, permits the inference that the safety-chain was not in fact used and supports the jury verdict responsive to Issues Nos. 30, 31 and 32. It is well established that negligence may be proved by circumstantial as well as direct proof. J. H. Robinson Truck Lines, Inc., v. Raymondville Independent School Dist., Tex. Civ.App., 237 S.W.2d 359.

■ Ordinarily, as in this case, the standard of conduct required to meet the legal definition of "ordinary care" is a question for jury determination. In view of the proof in the record that towing attachments such as those here employed can and do slip and come loose even when properly "put there", the jury might justifiably conclude

that ordinary prudence would dictate a more frequent and detailed inspection of the attachments than appellant testified to having made. The jury answers to Special Issues Nos. 22 and 23 are thus supported.

To undertake to review the testimony respecting each of the many acts or omissions of negligence found by the jury to be chargeable to the appellant would unduly extend this opinion. We have mentioned the foregoing findings because their evidentiary support is entirely independent of the testimony of Carroll, which appellant contends conclusively exonerates him. What we have said demonstrates the lack of merit in appellant's first proposition.

■ Among the formal points of error which appellant states are germane to his first proposition is point No. 23. By that point appellant asserts his right to a reversal "because the judgment based on the verdict is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust." We are of the opinion that the issue as stated is legally insufficient to invoke the fact-reviewing jurisdiction of this Court. Furthermore, since appellant has failed to point out the evidence which he says preponderates against the verdict, we must assume that he relies solely upon his assertion that the testimony of Carroll, above outlined, completely exonerates him from liability. However, we have carefully reviewed the entire record as we would be required to do had such jurisdiction been properly invoked. We conclude that we cannot say that the verdict of the jury is in any respect contrary to the weight of the evidence.

Appellant's proposition No. 2, and his formal points germane thereto, are as follows:

■ "The findings of the jury in response to Special Issues No. 3, 44, 45 and 58 to the effect that Carroll was acting as a loaned servant under the orders or authority of Paul Smith and not in the scope of his employment with Bulk Barites, Inc. are without support and are contrary to the overwhelming weight and preponderance of the evidence. (7th, 11th, 17th, 19th and 23rd Points of Error Restated)"

In support of this proposition, appellant cites the following testimony of the witnesses Evans, Carroll and Smith:

### Evans

"Q. You also knew Mr. Carroll, he was your employee? A. Yes, sir.

"Q. You knew of his experience, did you not? A. I knew of his experience.

"Q. And you relied upon and trusted Mr. Carroll to do properly what he undertook to do, didn't you, Mr. Evans? A. I did.

"Q. Now, you were Mr. Carroll's boss? A. Yes, sir.

"Q. Isn't it true that you would be the one that he would normally look to for any instructions and suggestions that he wanted in carrying out his work? A. Under any operations of ours I assume that he would, yes, sir."

### Carroll

"Q. You were out there that night, you were working with Bulk Barites, Inc.? A. Yes, sir.

"Q. You were working in your employment for that company, were you not? A. Yes, sir.

"Q. You were getting paid for the work you were doing? A. Yes, sir.

"Q. Now, did Mr. Evans give you any instructions as to what to do and not to do? A. No, sir, he sure didn't.

"Q. He didn't tell you not to pitch in and help, did he? A. No, sir.

"Q. He stood there and watched while you did whatever was done? A. That is right.

"Q. And I believe you said a while ago that all of you pitched in and helped to get the job done? A. That is right."

\*　\*　\*　\*　\*　\*

"Q. Now, you were in charge of what was being done out there? A. No, sir.

"Q. Mr. Evans there was your boss? A. Yes, sir."

: Smith

"Q. Did you give any order to Mr. Carroll or to Mr. Palmer while this was going on, tell them or ask them to do anything in particular? A. No, sir."

*   *   *   *   *   *

"Q. Did you control the actions of Mr. Carroll and Mr. Evans and Mr. Palmer out there at the time the truck was being hooked together? A. No, sir."

The quoted testimony might, in our opinion, support findings contrary to those made by the jury in response to the complained-of issues, however the record reflects evidence which amply supports the findings made. Appellee's summarization of that evidence, all of which is reflected in the record, is as follows:

"James K. Evans testified: that before this accident, Paul Smith had repaired clutches, changed bearings, sprockets, chains 'and so forth' on the mud handling equipment of his company, had always charged the company in the past a fair price by the hour on the amount of work he did so that witness didn't ever discuss with Paul how much he was going to charge for pulling the unit out of the mud but just assumed 'he would give us a fair price', called him 'as we have previously done,' and told him what we wanted to do, and assumed that he would charge us a fair and reasonable price for his work; that in the oil field, the normal procedure is to charge by the hour for a winch truck of the type used here and anybody that does any winch truck work in the oil field would charge by the hour 'according to the size of the truck' regardless of what they were doing with it, but that not being 'in that type of business,' witness didn't have any idea how much an hour; that his prime reason for going to the scene was to see that the load was taken off, that

the truck which was broken down was repaired, and the two loads delivered to the rig; that his job was to oversee the men that work under him and see that the loads are delivered, and in this particular case, to see that the load was taken off of one truck and put on to another and the load taken on to the rig; that he did not 'attempt in any manner to tell Paul Smith how to pull the truck out or tow the truck or give him any directions in that respect' but 'had asked him to go out there and do that, and he (Smith) was in charge of it,' and that witness felt that having called Paul to do the job, he had confidence in his doing it, figured that he knew what he was doing, could take over and do what he liked because the job was up to him, and he (witness himself) didn't have anything particular in *what* was done about the tying on of the truck; that about that time, one of them having driven up with an empty truck to unload this one (that was stuck) on to and without witness having asked them to do it, these other boys 'pitched' in there just to help him (Paul) out and tie the winch line on, and one thing and another, *for him*, just voluntarily jumped in to help him out without witness noticing in particular how the truck was tied on or anything of that sort; that witness didn't instruct his men to assist Mr. Smith in any way, but that being there, it was just a matter of courtesy that 'they just fell in and helped to do the work'; that he was not 'Carroll's boss in carrying out Paul Smith's work'; that he himself had never in his life tied a truck on, and because he had never had the experience, he wouldn't say that he would have known how to tie it on and 'it wasn't my business to do so'; that because he wasn't paying any particular attention to what the operation was or just what was going on but was sitting in his car, he didn't in fact 'know exactly what lines were put on or just how they were put on' but 'paid no particular attention to that'; that while at the time of its being done, Carroll, Palmer and himself were present and he believed

that Carroll was assisting in the hooking on of this truck of his to the winch truck, he himself 'gave no instructions one way or another as to what was to be done or how it was to be done by Carroll in doing whatever he did out there' or 'to any of them that were handling the operation' or any instructions at all, 'and whatever they did was strictly voluntary on their part'; but that from his knowledge from what he could see of it, from his knowledge of Paul Smith and Paul's knowledge of hooking them on, witness assumed that the two vehicles were hooked on properly and did not either know how many chains or lines secured them together or inspect the manner in which they were hooked up; that from his own experience, he wouldn't be any expert on how to tie on a truck or say whether this piece of equipment that hit Dr. Dye's building and which was owned by Bulk Barites, was tied on properly or not; but that at the time Paul Smith left for town, witness had furnished him no driver, there was no one from the (Bulk Barites) company that came in with him and he (Paul Smith) having 'had the truck tied on, it was under his exclusive control.' "

"Paul Smith testified: that Mr. Evans 'was sitting in the car practically the whole time this was going on', 'didn't have nothing to do—he wasn't telling me nothing and I was telling him nothing'; that with reference to whether 'that business of driving his own truck into town was on his own business,' witness 'generally always' drove his truck where he wanted to and didn't remember it, if ever Evans did tell him how to come into town, what road or street to take or anything of that sort; but that having himself tied the safety chain around the headache rack, 'pitched the chain back there and told him to tie it on,' witness did 'believe Mr. Carroll had put the (other) end of it on the other truck'."

"C. E. Carroll testified: that while Mr. Evans didn't tell him to pitch in and help or give him any instructions 'as to what to do or not to do', and not anybody from Bulk Barites told him how to do a thing like tying on the equipment, Paul Smith 'was there when I got there, and we all pitched in and went to work together'; that while he didn't 'believe anybody' actually told him to hook *the winch line* on, he was '*the only one*' that tied Paul's winch line onto the Bulk Barites truck to get it out of the mud hole and remembered asking Paul Smith to examine the way it was tied on; that he himself was there at the time at which Paul 'did examine it' and *say* 'he *thought* it was all right, it looked all right to *him*'; that while he believed he himself and *Paul Smith* took the fog lights off the bumper of the Bulk Barites truck, 'Eddy Palmer probably helped on it' but that he wouldn't say that Palmer did any certain thing and that it was as far as he himself could go to say that either Palmer or *any* of the others 'probably helped.'"

"William Edwin Palmer testified: that at the time of the trial he was employed by Evett's Furniture as a salesman; that while on or about August 2nd or 3rd, 1953, he was 'in the general employment of Bulk Barites', hauled a load of mud to a rig in another truck than the one that got stuck and stopped there where he twisted off an axle on his truck trying to pull it out, then came to Bay City, got help, went back and was fixing his axle at the time, he did not have 'anything whatever to do with the tying on of the truck that was stuck in the mud to the winch truck of Paul Smith'; that he did not help take the fog lights off the truck, was not there when it was done and didn't remember that; that he left a few minutes after Paul Smith took off with the other truck, followed him for 3 or 4 miles where he was able to observe the way that the Bulk Barites truck was being pulled along the highway but that there wasn't a line tied from the headache rack back to the other truck and he couldn't say where the one there was tied."

The law applicable to fact findings which this evidence will support is discussed in detail in Texas Refining Co. v. Alexander, Tex.Civ.App., 202 S.W. 131, and in Rector v. Walden, Fulton & Payne, Tex.Civ.App., 276 S.W.2d 933. Not only does the proof above summarized support the verdict but we cannot say the findings responsive to the complained-of issues are against the weight and preponderance of the evidence.

Appellant's next proposition, which in proper sequence is his third but which he through apparent inadvertence has designated No. 4, is said to be germane to formal point of error No. 20. Point of error No. 20 is in the following language: "The trial court erred in entering judgment in favor of F. E. Dye, plaintiff, and/or in favor of Bulk Barites, Inc., cross-plaintiff against defendant, Paul Smith because there existed a direct and irreconcilable conflict in the findings made by the jury in response to the following material issues:

"(1) Between Issues 3 and 11.

"(2) Between Issues 12, 13, 14 and 37, 46, 47.

"(3) Between Issues 11, 42 and 45.

"(4) Between Issues 42, 43, and 44, 45.

"(5) Between Issues 56, and 4, 5, 6.

"(6) Between Issues 58, and 11, 56.

"(7) Between Issues 20 and 22."

It has been frequently held that it is the duty of courts to construe verdicts as not irreconcilably conflicting when there is any reasonable explanation of seeming conflicts. For the purpose of possible reconciliation, apparent conflicts should be examined in the light of the facts in the particular case, the pleadings and the evidence, the manner in which the issues were submitted, and in view of the other findings when considered as a whole. Traders &

General Insurance Co. v. Wilder, Tex.Civ. App., 186 S.W.2d 1011. Pruitt v. General Insurance Corporation, Tex.Civ.App., 265 S.W.2d 908.

It is undisputed in the record that Carroll and perhaps Eddy Palmer "pitched in" and assisted Smith in securing and tying the Bulk Barites, Inc. truck to Smith's winch truck. Within the common and accepted meaning of the term, Smith and the employees of Bulk Barites, Inc. were acting jointly in that operation, as found by the jury in response to Special Issue No. 11. We do not see, however, that that finding conflicts with a finding that Smith had exclusive control of the operation, as found in response to Issue No. 3. Particularly is this true in view of the findings responsive to Issues Nos. 43, 44, 45 and 58. The same conclusions are justified relative to the asserted conflict between the answers to Issues Nos. 12, 13 and 14 on the one hand, and 37, 46 and 47 on the other, and between 11, 42 and 45. We see no conflict, either in law or in fact between the finding that Carroll was a loaned servant acting under the orders or authority of Smith, and the finding that he performed such services as an accommodation to Smith. In the light of our ruling relative to appellant's proposition No. 2, the applicability of the doctrine of respondeat superior resolves any alleged conflict between Issues Nos. 56 and 4, 5 and 6 as well as between 58 and 11 and 56. Relative to appellant's assertion of conflict between Issues Nos. 20 and 22, it is to be noted that in response to Issue No. 20 the jury refused to find that Smith failed to keep a proper lookout as to the condition of the tow line. This negative response does not amount to a finding that he kept a proper lookout, and does not conflict with the finding responsive to Issue No. 22.

Appellant's proposition No. 5 (in proper sequence, No. 4) complains that the trial court erred in entering judgment for plaintiff for damage to his building in the amount of $7,500 because there was in-

sufficient competent evidence to sustain the jury's finding, the court's instructions precluded the jury's consideration of the evidence relating to cost of repairs and the amount of damages awarded was manifestly too large. This proposition is said to be germane to appellant's 3rd, 5th, 7th, 8th, 17th and 22nd formal points of error.

■ Appellant's complaint relative to the insufficiency of the evidence is directed to the asserted lack of qualification of the witness, W. T. Cox, who testified that before this collision the building owned by plaintiff was reasonably worth $35,000 and immediately after the collision was reasonably worth $27,500, a difference of $7,500. Respecting his qualifications, the witness was shown to be in the real estate business in Bay City and to have been so engaged for several years. He testified that he knew the reasonable market value of property in Bay City. He owned a building adjoining that of plaintiff, and testified that he knew the value of plaintiff's building. Under the authority of City of Houston v. Schorr, Tex.Civ.App., 231 S.W.2d 740, and cases therein cited, we hold that the testimony above summarized justified the admission of the witness's testimony relative to the value of the building before and after the damage. Appellant's objections, though strongly supported by evidence adduced on cross-examination of this witness, go to the weight rather than to the admissibility.

The trial court submitted Special Issue No. 71 to the jury in the following form:

"What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate the plaintiff for the damage done to his building, if any, proximately caused by the collision in question?

"Answer by stating the amount, if any, in dollars and cents.

"In arriving at the above amount you will only take into consideration and consider only the difference in the reasonable market value of said building in this vicinity immediately prior to the collision and the reasonable market value of said building immediately after the said collision."

The jury answered this Issue "$7,500.00."

■ We feel bound to hold that the testimony of the witness Cox is sufficient to support this Issue and the jury's verdict responsive thereto, and that we cannot say that the verdict is contrary to the overwhelming weight and preponderance of the evidence. The only other testimony relative to damages to the building was adduced from the witness, A. W. Hite, offered by plaintiff, who was a general contractor and who testified that he would not contract to repair the damage to plaintiff's building for less than $7,500. On cross-examination, this witness was shown to have made estimates of the cost of repairing all damage which his inspection disclosed for the sum of $4,955, including a profit to himself. He explained the discrepancy by stating that in making repairs he might discover damage not disclosed by his inspection and would not contract the job for less than $7,500 in order to protect himself against such contingency. Appellant complains that the instruction of the court relative to Special Issue No. 71 denied him the benefit of Hite's estimate of $4,955. We are unable to agree. Under the method employed in the submission of this element of damages, the instruction is correct and appropriate. Anderson Furniture Co. v. Roden, Tex.Civ.App., 255 S.W.2d 345; Crain v. West Texas Utilities Co., Tex.Civ.App., 218 S.W.2d 512.

■ While we are unable to sustain appellant's proposition No. 5 for the reason which he assigns, we are of the opinion that there is a manifest error in the trial court's judgment. This error results from the fact that the total recovery allowed plaintiff is in part composed of the total of the elements of damage found by the jury in response to Issues Nos. 70 and 71.

Special Issue No. 70 and the jury's answer thereto are as follows:

"What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate the plaintiff for the loss of the use of his building due to the collision in question while necessary repairs are being made, if any should be necessary, which were proximately caused by the collision in question?"

To this Issue, the jury answered "$1,-660.00."

We think it manifest that when Issues are submitted relative to damage to property in the manner in which Issue No. 71 was submitted, namely, the difference in value before and after the damage, that such issue comprehends all of the damages recoverable. The element of loss of rental value or use inquired about in Issue No. 70 is necessarily included in Issue No. 71 under this submission. Therefore, the judgment, in allowing recovery based upon the findings responsive to Issues Nos. 70 and 71, permits a double recovery to the extent that it rests upon the finding responsive to Issue No. 70; in other words, to the extent of $1,660. Chicago, R. I. & G. Ry. Co. v. Zumwalt, Tex.Com.App., 239 S.W. 912; Pasadena State Bank v. Isaac, 149 Tex. 47, 228 S.W.2d 127; Restatement of The Law of Torts, Vol. 4, Sec. 928.

We further think that the error is raised by appellant's Point of Error No. 22, which complains, "The Trial Court erred in rendering judgment in the amount of damages found by the jury in response to Special Issues Nos. 68, 69, 70, 71 and 72 because each of the amounts so awarded were manifestly too large."

We sustain such point in so far as it relates to Special Issue No. 70.

The conclusion which we reach relative to the error in the submission of Special Issue No. 70 disposes of appellant's com-, plaint, that the instruction of the court relative to Special Issue No. 71 deprived him of the benefit of the testimony of the witness Hite. The fact that the jury answered "$1,660.00" in response to Special Issue No. 70, coupled with our conclusion that that element of damages was as a matter of law included in the answer of the jury to Special Issue No. 71, leads to the conclusion that the jury in answering Special Issue No. 71 "$7,500.00" must have given consideration to the testimony of the witness Hite. In any event, we are unable to say that the error of which appellant complains, if it be error, probably caused the rendition of an improper judgment in the case as required by Rule 434, Texas Rules of Civil Procedure.

We also are of the opinion that appellant is correct in his proposition No. 6 (in proper sequence, No. 5), wherein he complains of the judgment in so far as it includes an item of $500 found by the jury in response to Special Issue No. 72 to be the amount of damage done to plaintiff's real estate. As stated before, the reason for the litigants' separate inquiries respecting the damage to the building, in Special Issue No. 71, and damage to the realty, in Special Issue No. 72, is not disclosed; however, it is undisputed in the record that aside from damage to the building, the only damage to realty consisted of the destruction of a cedar tree and certain shrubs. There is no evidence whatsoever relative to the value of the latter. In regard to the cedar tree, plaintiff Dye was permitted, over appellant's objection, to testify that the tree "ought to be worth about $500.00." This testimony was given in response to the question, "What would you say was the value of that tree to you, Doctor, the reasonable value of that tree?"

Special Issue No. 72 was submitted to the jury in the following form:

"What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably

compensate the plaintiff for the damage done to his real estate, if any, proximately caused by the collision in question?

"Answer by stating the amount, if any, in dollars and cents.

"In arriving at the above amount you will only take into consideration and consider only the difference in the reasonable market value of said real estate in this vicinity immediately prior to the collision and the reasonable market value of said real estate in this vicinity immediately after said collision."

We agree with appellant's proposition that there is no competent evidence to support the jury's answer of $500 in response to this Issue. The rule is stated in International-Great Northern R. Co. v. Casey, Tex.Com.App., 46 S.W.2d 669, 670, as follows:

"The rule is settled that, where property is destroyed or injured, which has a market value, this must be shown by the owner as the measure of damages; where it has neither a market value nor a real value, but it is shown what it would cost to replace or reproduce the article, then such cost is the measure of recovery. Where it has neither a market value nor a real value, and it cannot be reproduced or replaced, then in that event it would be proper to show what it was worth to the owner."

The record contains no evidence as to the market value of plaintiff's real estate which will support the verdict responsive to the issue as here submitted. Plaintiff Dye's testimony concerning the value of the tree to him would be admissible only after it is established that the tree had no market value and could not be reproduced or replaced, and when that predicate is laid, it would be necessary to use a different measure of damages than was employed in Special Issue No. 72. The case of Lucas v. Morrison, Tex.Civ.App., 286

S.W.2d 190, relied on by appellees, is clearly distinguishable in that in that case it was stipulated that the tree there involved had no market value. We sustain appellant's Point of Error No. 2 which is germane to the proposition discussed.

Appellant's next proposition, which he designated No. 7, is:

"The Trial Court erred in admitting testimony concerning loss of use of Plaintiff's building and of Bulk Barites' tractor and in entering judgment against Paul Smith based on the jury's findings as to the value of such loss of use. (4th, 6th, 15th and 22nd Points of Error Restated.)"

We have already stated our conclusions relative to the allowance of $1,660 to plaintiff for the loss of use of his building. Appellee, Bulk Barites, recovered judgment against appellant in the sum of $915.89, as the cost of repairs necessary to its truck. This element of damages, aside from the complaint regarding liability, is not attacked. Bulk Barites also recovered judgment for the sum of $315 for the loss of use of its truck, as found by the jury in response to Special Issue No. 69. It is noted that the vice inherent in Special Issue No. 70 is not present in Special Issue No. 69. The complaint is that there is no competent evidence to support the verdict responsive to this issue. We see no merit in appellant's contention. We have examined the evidence and hold that there is ample competent evidence to support the verdict. Pasadena State Bank v. Isaac, 149 Tex. 47, 228 S.W.2d 127; Commercial Acceptance Trust v. Parmer, Tex.Civ.App., 241 S.W. 586.

Among appellant's formal points of error is No. 21, to the effect that the trial court erred in refusing to set aside the verdict because of jury misconduct. No statement or argument under such point is contained in his brief, and this Court is not informed of the misconduct complained of. We hold the point to be abandoned.

We have sustained appellant's Points of Error Nos. 2 and 22. All other points of error are overruled.

Our ruling in respect to appellant's points of error has presented a question as to the proper order to be made on this appeal. Were the error limited to that asserted by appellant in Point of Error No. 22, which we have sustained, we would be in a position to modify the judgment of the trial court and, as modified, to render the same, as provided for in Rules 434 and 435, T.R.C.P. This is because the error is one of law in submitting Special Issue No. 70 to the jury. The fact that appellant does not attack the verdict in response to Special Issue No. 70 in his motion for judgment non obstante veredicto would not militate against such order under Rule 301 because the judgment as so modified would rest upon the verdict when the proper legal construction is placed thereon. Upon a fully developed record, the jury has found the total amount to which plaintiff is entitled for damage to his building to be $7,500. Since the element of damage inquired about in Special Issue No. 70 is as a matter of law included in Special Issue No. 71, Special Issue No. 70 is surplusage.

However, the same conclusions are not applicable to the error complained of in Point of Error No. 2. It is undisputed in the record that plaintiff Dye sustained damage to his tree apart from that sustained to his building. Because of errors heretofore discussed, the case is not fully developed in regard to the amount of such damages. In the absence of the offer of remittitur, we are limited to an order of reversal and remand. As we construe the opinion of the Supreme Court in Luling Oil & Gas Co. v. Humble Oil & Refining Co., 143 Tex. 54, 182 S.W.2d 700, the entire case must be remanded.

Reversed and remanded. CODY, J., not sitting, and original opinion filed September 27, 1956. Former judgment set aside, vacated and annulled, appellees' motions for rehearing granted, and opinion filed Octobed. 11, 1956.

### On Filing of Remittitur.

In his motion for rehearing, appellee F. E. Dye has voluntarily offered to remit the sum of $500 being that part of the trial court's judgment which rests upon the jury verdict responsive to Special Issue No. 72. While we concluded that we were in a position, under the provisions of Rules 434 and 435, T.R.C.P., to reform and render the judgment in so far as it permits recovery by said appellee of the sum of $1,660, based upon the verdict responsive to Special Issue No. 70, appellee has also, in his motion, voluntarily offered to remit such sum of $1,660. He asks that we set aside the judgment entered in conformity with our original opinion, and reform and affirm the judgment of the trial court in conformity with the tendered remittitur. Appellee Bulk Barites, Inc., has filed a motion asking that we grant the motion of appellee Dye, and reform and affirm the judgment accordingly. Numerous authorities in support of the respective motions are cited, including Hill v. Texas, New Mexico & Oklahoma Coaches, Inc., 153 Tex. 581, 272 S.W.2d 91, 92.

We have concluded that a reformation of the trial court's judgment in conformity with the tendered remittitur will cure the error because of which we ordered a remand of the case. We feel that under the method of submission employed in the trial of this case, the items to which the remittitur is directed are severable and capable of definite and accurate ascertainment, and that under the authorities the motions of the appellees should be granted, and the judgment of the trial court reformed and affirmed as therein prayed for.

We have re-examined the other points advanced by appellant for a reversal of this cause, and, being of the opinion that none of such points present such error as requires a reversal, the judgment of the

trial court is reformed by deducting from the amount of damages awarded to appellee F. E. Dye, the sum of $2,160, and as thus reformed, it is affirmed, Associate Justice CODY not sitting.