HOUSTON NATURAL GAS CORPORA-
TION, Appellant,

v.

W. B. PEARCE et al., Appellees.

No. 13170.

Court of Civil Appeals of Texas.

Houston.

Feb. 27, 1958.

Rehearing Denied April 3, 1958.

Fulbright, Crooker, Freeman, Bates & Jaworski, Robert M. Welch, Jr., Houston, for appellant.

John V. Wheat, James T. Wright, Houston, Dyche, Wheat & Thornton, Houston, of counsel, for appellees.

WERLEIN, Justice.

This suit was filed March 23, 1953, by appellees, W. B. Pearce et al., against appellant, Houston Natural Gas Corporation, to recover damages to their building allegedly caused by appellant's negligent failure to properly backfill and tamp a ditch or trench it had excavated in front of appellees' building in June, 1950, for a gas pipeline. The case was tried to the court without a jury and resulted in a judgment for appellees in the sum of $10,500. Appellant has duly perfected its appeal to this Court.

Appellant has grouped its first 18 points of error, which have to do with the matter of liability vel non on the part of appellant in connection with the work that it did in laying its 6-inch gas pipeline under the sidewalk and parallel therewith in front of appellees' building. The roof of

plaintiffs' building was drained by a cast iron drainpipe running some inches underneath the sidewalk and crossing appellant's ditch line at right angles above appellant's gas pipeline. Appellees alleged that appellant after laying its pipeline in said trench failed to backfill and tamp the same sufficiently to prevent the earth lying under the sidewalk from settling or sinking, and that as a result of such failure the walk settled and pressed down against the drainpipe, causing it to separate or break at its joints, thereby causing rainwater coming from the roof of the building to flow into the area underneath the sidewalk instead of into the street adjoining. They further alleged that such condition in time created a super-saturated condition under the sidewalk, which in turn caused cracks in the basement wall of their building and resulted in water flowing through such cracks and into the basement of the building.

Appellees relied largely upon circumstantial evidence in attempting to prove that the appellant was negligent in failing to backfill and tamp its ditch properly and that such negligence proximately caused the drainpipe to settle as a result of the settling of the sidewalk. Appellant contends that the circumstances and evidence show that the drainpipe had settled prior to the settling of the sidewalk and that the drain settled not because of the manner of the backfilling and tamping of the ditch, but because of water getting under the drainpipe from sources not pleaded as being attributable, or not actually being attributable, to the appellant.

The parties stipulated that the sidewalk was 15½ feet in width from the building to the curb, and the pipeline in question was located 9½ feet South of the south wall of the building and 6 feet from the curb, ran the entire distance of the sidewalk in front of appellees' building, and was buried approximately 3 feet below the surface of the ground. The sidewalk and pipeline are in an easement dedicated to the Public for street, sidewalk and utility company use, and appellant is a utility company. It was further stipulated that the drainpipe in question was at all times the property of the appellees, and that it was located approximately 1½ feet from the southwest corner of the building, and was 6 inches in diameter, and in three 5-foot lengths, the first joint from the curb being in the course where the appellant's trench was dug. It was also stipulated that appellees do not rely upon the doctrine of res ipsa loquitur but solely upon specific acts of negligence alleged in their amended petition.

The trial court made its findings of fact, the material findings being substantially as follows: Commencing at the west edge of the sidewalk in front of appellees' building, appellant used an interrupted trench method, excavating a series of holes approximately 8 feet in length, which holes were separated by approximately 8-foot lengths of undisturbed sidewalk. In tunneling under the undisturbed sections of sidewalk appellant dug from each end of the undisturbed portion angularly downward from the sidewalk level to the center of the undisturbed portion, so that in the center of the undisturbed portion the hole was at the bottom of the ditch and large enough for the gas line to pass through. The first open excavation made by appellant exposed the drainpipe located at the southwest corner of appellees' building at a point where two pieces or joints of the cast iron pipe were joined together. After such pipeline was laid, appellant failed to backfill the trench with adequate amounts of dirt or other fill material and to tamp sufficiently to prevent the earth lying under the concrete sidewalk from settling or sinking, and that as a result of appellant's failure to do so, the concrete slab over the trench cracked and sank, causing said drainpipe to separate at its joint in the ditch line, thus exhausting rainwater coming from the roof of appellees' building into the area beneath the sidewalk. Following the separation of such drainpipe, the area underneath the

sidewalk became flooded and the soil thereunder became thoroughly saturated with water. That in time, following the flooding of the area underneath said sidewalk, the accumulated water migrated to and against the front or south basement wall of appellees' building and down to the foundation of said building, causing a settling of the foundation of the building and a cracking of the front basement wall thereof. That on or about June, 1951, the accumulated water for the first time noticeably seeped through the cracks in the front or south basement wall of the building and into the interior thereof, and that at such time work was performed by appellees on the interior basement wall on the south side of the building, in order to prevent the seepage of water through cracks therein. That in February of 1952 the seepage of water through cracks in the front basement wall of said building became pronounced and the tenant of such building made demand upon appellees to repair the leaking condition of the wall. That in June 1952 appellees caused to be removed a portion of the sidewalk lying along the front side of their building, at which time the flooded condition underneath such sidewalk first became apparent. That in the months of June and July, 1952, appellees had repairs made to such building designed to repair the damage caused by the accumulation of water underneath such sidewalk, and that the reasonable cost of such repairs in Houston upon such dates was $10,500. That the damage to appellees' building caused by the accumulation of water under the sidewalk occurred after June 6, 1950, and resulted in the cracking of the front basement wall of said building and the seepage of water therethrough and was permanent in nature, and the market value of such building was diminished by reason thereof in the amount of $12,700.

The court further found that the method of excavation and the interrupted trench method used by appellant was the customary and usual method used by companies in Houston, but that the method of backfilling was not customary or usual.

Based upon such findings of fact, the court made its conclusions of law, concluding that appellant was negligent in failing to properly backfill with a sufficient amount of dirt or other backfill material the trench which it had dug and in failing to properly tamp the backfill dirt that appellant placed in such trench, and that the appellant was under a duty to appellees to properly backfill and tamp the trench under said sidewalk, and that the negligence of appellant in not doing so was a proximate cause of the damage resulting to appellees' building. The court also concluded that appellees were not guilty of contributory negligence and that the first actual notice which they had of defendant's negligence was during the month of June, 1952, and that there was no evidence that appellees could have by reasonable diligence discovered such negligence prior to that time. The court further found that limitations as to appellees' cause of action commenced to run at the time they discovered or should have discovered by the exercise of reasonable diligence the cause of the cracks and leaking in their basement walls which the court found was in June, 1952, and that the statutes of limitation did not bar plaintiffs' action. The court further concluded that appellees could not interfere with nor control appellant in the reasonable use of the easement for the purposes for which the easement was dedicated, including that of laying a natural gas pipeline under the sidewalk in question, and that the measure of damages applied by the court was the diminution of market value of plaintiffs' building resulting from the damage caused by appellant's negligence, such diminution and market value being measured by the difference in the market value of the property immediately before and immediately after the injury, but that plaintiffs' recovery was limited, however, to the amount prayed for in their petition, which was $10,500, for which amount appellees were entitled to judgment.

 It will be necessary for this Court to review the evidence adduced at the trial in order to determine whether or not the findings of the court and its conclusions of law based thereupon are supported by the evidence. Findings of fact have the same force and dignity as a jury verdict upon special issues. If they are supported by some competent evidence they will not be disturbed upon appeal unless they are so against the overwhelming weight of the evidence as to be clearly and manifestly wrong. Wells v. Yarbrough, 84 Tex. 660, 19 S.W. 865; Cook v. Mann, Tex.Com.App.1931, 40 S.W.2d 72; Kennedy v. General Geophysical Co., Tex.Civ.App., 213 S.W.2d 707, ref. n. r. e.; Dixie Distributors v. Lane, Tex.Civ. App., 211 S.W.2d 581, ref. n. r. e.

With reference to tamping and backfilling, witness Waddell testified that in 1950 he did not notice anything out of the ordinary with respect to the sidewalk in front of the building, but that in 1952 he noticed the sidewalk was pulling away from the building and was settling, and certain portions had been replaced because somebody had gone in under the sidewalk apparently with a pipeline. That part of the sidewalk was completely depressed. The new cement patches had sunk and become depressed as much as an inch or two.

Witness Krimmel testified that appellant tamped back the same dirt that was taken out of the trench, and what they could not get back in they hauled off, and that he saw men put it in and hand-tamp it and level it within about 2 inches of the sidewalk.

Witness Branson, whose business was waterproofing and roofing, testified that when they removed the sidewalk in 1952 and dug out the trench the west end of the sidewalk had all sunk quite a bit and was cracked; that where they dug out the trench for the pipe it was quite open under the sidewalk and very "salky" and wet; that there were open spaces under the sidewalk in which there was no dirt at all,

and that where it had been tunneled between the areas where they had dug down there were open spaces where not much dirt had been put back. Such open spaces were approximately 12 to 18 inches deep and approximately 18 inches wide. He stated that the condition he found when they opened up the sidewalk there, was not the usual and customary situation that you would find when you followed the Gas Company in. He testified as follows:

"Q. Would you say the job they did underneath the sidewalk there, based on your observation was a good or bad job? A. I wouldn't say it was a first class job, no.

"Q. Would you say it is the usual and customary way they do this work?

\* \* \* \* \* \*

"A. Not according to the other work I have seen."

When asked whether at the time he did the work the concrete sidewalk was pressing down on appellees' drainpipe, at the west end of the building, he stated that it had sagged on the west end but he could not say whether it was pressing on the pipe.

One Perkins, a civil engineer, testified that whether water was more likely to follow a backfill where pipe has been laid than the undisturbed soil, depended on the backfill that is placed there; that it depended on the degree of compaction that is put into the backfill material. He further testified that if water were discharged right at the joint from a downspout with an 80-foot head it would wash the soil at such point if the soil had some place to go.

Witness Castles, a consulting engineer, testified that if you just tossed dirt back into the trench, filled it up to the top to lay concrete over it, it would have a density of possibly 50 to 60%, depending on how loose it was, and that the voids would run as much as 50%. He further stated, when asked with respect to a constant pressure on an enclosed body, that there could be

a failure in the pipe. The exertion is going to be against the pipe when there is something pushing on it, and it possibly could depress as much as 2 feet.

When asked whether he knew how the soil would react, he stated:

"To confine me to two inches or four inches I wouldn't be able to say but I would say a definite depression and it would be a cavity under that point of an extensive nature."

Finally, he testified that if the dirt underneath the slab settled, the slab would tend to follow the dirt down.

Appellant's witness, Bowles, when asked:

"If you had an opening to pump the water out, couldn't you pump it out say the next morning if the water, if the walls of the trench were undisturbed and firm you could put dirt back in?"

answered: "Yes, sir, and mechanically tamp it."

The testimony in the present case was that the dirt put back into the trench was hand-tamped. We believe that the testimony of the witnesses was sufficient to justify the trial court in finding that appellant failed to backfill the trench with adequate amounts of dirt or other material and to tamp same sufficiently to prevent the earth lying under the concrete sidewalk from settling or sinking, and that the concrete slab over the ditch or trench cracked and sank, causing the drainpipe to separate at its joint in the ditch line, thus exhausting water from the roof of appellees' building into the area beneath the sidewalk. Undoubtedly, the sinking of the sidewalk and the drainpipe would tend to pull the drainpipe away from the building, thereby causing a break near the building also.

Appellant requested the court to make some 44 findings of fact. Many of these requested findings of fact were evidentiary and properly refused. However, in view of appellant's contention, it is necessary to discuss some of the findings that the court did make at the request of appellant, to see if they are reconcilable with the findings originally made by the court.

Appellant strenuously contends that the water accumulating under the sidewalk resulted from a hole in the drainpipe at the joint over the trench of appellant, and that such hole was made by a sharp instrument of some kind. The court, at the request of appellant, found that when the sidewalk in front of appellees' building was opened in 1952 by appellees, a hole was found broken into the drainpipe at the west end of plaintiffs' building, being in the general course of where the appellant laid its line, and that appellees in opening the sidewalk in 1952 did not break the hole in the drainpipe.

There is no evidence whatever that there was any hole in the drainpipe in 1950 when appellant laid its gas pipeline. The testimony was that when the opening was made in 1950 to lay the gas pipeline, the soil was dry. Appellant relies upon the testimony of Mr. Branson who testified on cross-examination by appellant's counsel that whoever it was that did the work in 1950 apparently knocked a hole in it. This same witness, however, testified that when he examined the drainpipe underneath the sidewalk in 1952 in an attempt to determine where the water was coming from: "Well, you could tell it came from that one broken spot that come across there." The one broken spot or hole was apparently the same hole which resulted from the separation of the joints of the drainpipe in appellant's trench line as contended by appellees. There was no testimony that there was more than one hole at such place. It would appear, therefore, that the court in making its finding that there was a hole in the general course where appellant laid its line, was referring to the one hole referred to by Branson. This would seem to be confirmed by the testimony of Waddell, who stated that when the sidewalk was opened up the drainpipe on the west side of the building was broken. He testified further

that such pipe was badly broken in one place and pulled away from the wall in other places. He stated that such breaks did cause the pipeline to sag. When shown appellees' Exhibit 6 showing the cast iron drainpipe in question running from the building to the curb, he made a circle with a fountain pen showing the break that he referred to. Such break was in the joint over appellant's trench. He also placed an "X" on the photograph at the point where the pipe pulled away from the wall of the building, some 9 feet away from the break over the trench line.

Mr. Branson also testified as to the joint over the trench line being mashed down, and as to the separation of the joint right at the building, and stated that water was coming out of both places. He did not testify as to water coming out of any other hole than the holes at the two joints. While there was testimony that the drainpipe itself would not have sagged if resting on dry dirt since approximately four-fifths of each joint would be on undisturbed earth, there was no testimony that the concrete pavement resting on the insufficiently tamped dry dirt would not sink. It is our opinion that the testimony with respect to the hole and the finding of the court relate to the hole caused by separation of the drainpipe at its joint in appellant's trench, and that such finding can be reconciled with the court's other findings.

Appellant also contends that the chain of events that occurred would not have occurred but for the fact that moisture got under the sidewalk and caused loosening of the earth, which in turn resulted in the slab sinking and the drainpipe sinking. The testimony is undisputed that the basement wall of appellees' building did not show any signs of leaking whatever until approximately a year after appellant put in its pipeline. The testimony discloses that later the sidewalk had pulled away from the building and was broken in a number of places and that the patched sections had subsided one to two inches. True, there was testimony that there were some cracks in the sidewalk

in 1951, but they were much worse in 1952, at which time some of the slabs had subsided. The court may well have concluded that the heavy concrete slabs together with the heavy weight superimposed thereupon by people walking upon the sidewalk pressed down the insufficiently tamped dirt, thereby imposing pressure upon the cast iron drainpipe, causing it to sag, thus opening up the joint over the appellant's trench where water could leak in and gradually accumulate, thereby creating the condition found in 1952 when the sidewalk was removed.

Appellant resorts to the supposition that water might have come from the adjoining lot or from some other source. We do not believe that the force and weight of the strong circumstantial evidence introduced by appellees can be counteracted by the assumption that water might possibly have gotten under the sidewalk in some other way. To require appellees to exclude every other possible hypothesis would be to make them prove their cause beyond a reasonable doubt instead of by a preponderance of the evidence.

■ While the court's additional Finding of Fact No. 16 was to the effect that water gaining access to the ground underneath plaintiffs' sidewalk would cause the drainpipe to settle regardless of how defendant's ditch had been backfilled and tamped, there was no finding as to how much or how far the drainpipe would have settled. Nor was it shown that any such sinking of the drainpipe without pressure on it would have been sufficient to have proximately resulted in the injury to appellees' property. This finding, therefore, is not irreconcilable with the court's other findings and conclusions of law.

■ Our courts have frequently held that both negligence and proximate cause may be established by circumstantial evidence. See J. Weingarten, Inc., v. Brockman, 1940, 134 Tex. 451, 135 S.W.2d 698, in which the court held that broad latitude is given in circumstantial evidence cases,

and that where legitimate inferences of negligence and proximate cause can be drawn from circumstances, it then becomes a fact issue and a jury verdict on such issue will not be overturned.

■ It is within the province of the jury or the court to draw any and all inferences reasonably capable of being drawn from the circumstances shown in evidence. Peveto v. Smith, 134 Tex. 308, 133 S.W.2d 572.

In Bock v. Fellman Dry Goods Co., Tex. Com.App., 212 S.W. 635, 636, the court stated:

"The plaintiff was not required to exclude the probability that the accident might have occurred in some other way. To so hold would impose upon her the burden of establishing her case beyond a reasonable doubt. She was only required to convince the jury by a fair preponderance of the evidence that the accident resulted from the negligence of the defendant. While it is true, as held by the Court of Civil Appeals, that in order to show that defendant's negligence was the proximate cause of the injury the evidence must present something more than mere conjecture or surmise, it is equally true that the cause of an accident may be inferred from circumstances. Both negligence and proximate cause may be established by circumstantial evidence."

See also Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609.

We think the cases cited by appellant are distinguishable. For instance, the case of Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1, was a malpractice case, in which the court would have to rely upon expert testimony for proof of negligence and proximate cause. In Socony-Vacuum Oil Co. v. Lambert, Tex. Civ.App., 180 S.W.2d 456, it was necessary for plaintiff to show that the deceased died as the result of an explosion from an enemy submarine, and that the defendant was negligent in failing to arm its vessel. The

court held that the plaintiff had not established his case. The court indicated, however, that if it had been shown that an enemy submarine had been seen in the vicinity within a reasonable time before, or after, the steamship was sunk, or that such a vessel had submerged in the vicinity before the explosion occurred, it would have constituted a circumstance, not a presumption, and the jury would have been warranted in giving it due consideration.

■ In the instant case from the testimony and circumstances the court was warranted in finding that the chain of events alleged by appellees was the proximate cause of the injury and damage in question.

See also Western Telephone Corporation of Texas v. McCann, 128 Tex. 582, 99 S.W.2d 895.

In Houston Belt & Terminal Railway Co. v. Scheppelman, Tex.Com.App., 235 S.W. 206, plaintiff alleged that in refilling an excavation made by the laying of a sewer pipe the defendant negligently failed to fill up and tamp down the earth under a sidewalk. As a result thereof, it sank at one point and raised or projected several inches higher at another point. The court stated that the change from the original condition of the sidewalk was a circumstance indicating negligence.

Appellant's Points 19 through 24 complain of the amount of damages recovered by appellees as being excessive because based in part on cracks in the basement wall not chargeable to appellant, and also on the ground that it was not necessary to do some of the work that was done, especially in connection with waterproofing the basement wall of the building. Appellant's 25th point complains that the trial court erred in applying the measure of damages based upon diminution in the value of appellees' building for the reason that the proper measure of damages was the cost of necessary repairs to place the building in the condition it was in prior to the injury in question. These points of error will be discussed together.

In its Finding of Fact No. VI the court found that following the flooding of the area underneath the sidewalk the accumulated water migrated against the front or south basement wall of appellees' building and down to the footing of the foundation thereof, causing a settling of the foundation and a cracking of the front basement wall. At the request of appellant, the court made its additional Findings of Fact Nos. 20 and 21, to the effect that the walls of appellees' basement were cracked prior to the time appellant did its work, and were not cracked to any greater extent in 1952 than they were in 1938.

Upon analysis, it appears that these findings are not necessarily inconsistent. It seems quite evident that the court's additional Finding of Fact No. 21 that the walls of plaintiffs' basement were not cracked to any greater extent in 1952 than in 1938, was based upon testimony of appellant's witness, A. M. Bowles, the only witness who testified as to the condition of the walls in 1938. The witness was asked whether there were any more cracks or less at the second visit to the building when he inspected it for the purpose of making a bid in 1952, than in 1938. He testified, "I couldn't say any more or less. It looked about the same." It will be noted that the question had reference to the number of cracks, and no question was asked concerning either the length or the width or depth of the cracks in 1938 or 1952.

The court's Finding of Fact No. XI was to the effect that the damage to appellees' building was caused by the accumulation of water under the sidewalk occurring after June 6, 1950, when appellant did its work, and that the same resulted in the cracking of the front basement wall of said building, and the seepage of water therethrough, and was permanent in nature. Although there were settlement cracks in the wall as early as 1938, according to Mr. Bowles, and the number of cracks appeared to him to be about the same in 1938 and 1952, the court may well have concluded that such settlement cracks were greatly increased in length, width and depth as the result of appellant's work. In this connection, it will be noted that Mr. Krimmel testified that he did not see any cracks in the basement from 1947 to 1951. The evidence is clear that the seepage began about June, 1951, which was approximately a year after appellant did its work. There was also testimony that a great deal more water was coming through in 1952, just before the pavement was removed, than in 1951. Some repair work was done on the wall in 1951, but it was not effective.

Branson testified that he observed there were settlement cracks in the building in 1952 but he did not know when they came. He further testified that there was a difference between settlement cracks and hairline cracks, and that in order for the cracks to occur it was necessary for water to get under the footing of the building. He further testified that waterproofing done after a building is found leaking is in a sense a patchwork or repair work, and it does not restore the building to its former condition; that the work done to stop the leaking condition of the building in 1952 was reasonable and necessary, and that the contract price paid for the work done in 1952 was a reasonable price in Houston at that time.

The first complaint of any water seeping through the wall was made by the tenant occupying the basement about June, 1951. The fact that water had not previously entered the basement through the cracks Bowles testified about, might indicate that there was little moisture in the soil prior to the work done by appellant, and also that the cracks were not as large or as deep or as long as they were in 1952. The court was thus justified in finding a settling of the building's foundation and a cracking of the basement wall as a result of appellant's work and in concluding that as a proximate result of appellant's negligence appellees' building was damaged.

The court found that the reasonable cost of repairs to the building was $10,500. The court also found, however, that water under

the sidewalk after appellant did its work resulted in the cracking of the front basement wall of the building and the seepage of water therethrough, and such damage was permanent in nature, and the market value of the building was diminished by reason thereof in the amount of $12,700. Since appellees sued for only $10,500, the court rendered judgment for that amount.

Appellant contends that the court applied the wrong measure of damages since it was not shown that the damage to appellees' building was permanent in nature. With this we cannot agree. The testimony clearly showed that although the work in 1952 stopped the leak, it did not restore the building to its former condition. Numerous cases have established the rule that the proper measure of damages for permanent injuries to a building, short of total destruction, is the difference between the market value before and after the injury. See Smith v. Dye, 294 S.W.2d 452, decided by this Court in a case involving damage to an office building resulting from a truck colliding therewith; and Bingham v. Johnson, Tex.Civ.App., 7 S.W.2d 665, in which suit was brought to recover damages to a cotton gin not totally destroyed and susceptible of repair. See also Crain v. West Texas Utilities Co., Tex.Civ.App., 218 S.W.2d 512, ref. n. r. e., in which suit was based on an alleged injury to a residence as the result of blasting operations. In these cases the measure of damages was held to be the difference in value of the property immediately before and immediately after the injury.

The cases cited by appellant are distinguishable from the instant case. In Fort Worth & D. C. Railway Co. v. Kiel, Tex.Civ.App., 195 S.W.2d 405, writ ref., n. r. e., suit was brought to recover damages to a swimming pool caused by defendant's railroad embankment damming up a small stream and causing high waters to back up into the swimming pool. There seemed to be no question but that the swimming pool could be restored to its former condition.

Therefore, the damage was not considered permanent.

In Burlington-Rock Island Railway Co. v. Newsom, Tex.Civ.App., 239 S.W.2d 734, suit was brought to recover damages to a well. The court held that the injury to the well was only temporary so that the damages should be limited to the cost of its restoration. In the case of Indiana Co-op Canal Co. v. Gray, Tex.Civ.App., 184 S.W. 2d 242, the plaintiff's land was flooded, and there was no permanent injury to the same.

It will be noted in the instant case the court also found that the repairs made by appellees were of the reasonable value of $10,500. There was testimony that such work was reasonable and necessary and the contract price of $10,500 was reasonable. It would thus seem that in the event the court did apply the wrong measure of damages, any error resulting therefrom was harmless, and would not warrant reversal of this case. A proper judgment will not be disturbed merely because it is based upon a wrong conclusion of law. See Andrews v. Key, 77 Tex. 35, 13 S.W. 640, 642, in which Judge Gaines, speaking for the court, said:

> "Appellant's remaining assignments of error complain of the court's conclusion of law. We need not consider them in detail, because it is immaterial whether the propositions of law announced by the court as the grounds of its judgment be correct or not, provided a proper judgment has been rendered."

See also Dallas Waste Mills v. Early-Foster Co., Tex.Civ.App., 218 S.W. 515, writ dismissed.

Appellant's Points of Error Nos. 26 to 29 are to the effect that the court erred in finding that the market value of plaintiff's building was diminished in the amount of $12,700 as a result of appellant's acts, for the reason that there was insufficient evidence to support such judgment and the same was against the weight and prepon-

derance of the evidence, and for the further reason that the testimony of plaintiffs' witness Irwin was incompetent and mere speculation. Appellant admitted the qualifications of Mr. Irwin, the realtor and appraiser who testified that he was familiar with the building. While he had not seen the condition of the basement in 1950 prior to the time appellant did its work, he examined the building in 1957 and made a deferred appraisal as of the 1950 date based on the type of construction of the building. His testimony was to the effect that in 1950 without any damage to the building it was of the reasonable market value of $253,900, exclusive of the real estate; and that it had been diminished, in his opinion, in the sum of $12,700 in value as a result of the water commencing to leak through the front basement wall. Mr. Irwin testified that the practice of making a deferred appraisal is a recognized practice in the appraisal profession, and such testimony is uncontradicted.

Appellant contends that the testimony of Mr. Irwin is totally incompetent since he testified that even if the leaking could be stopped for a nominal amount, he would still testify that the building had been damaged in the amount of $12,700 if water had gotten down into the basement and had covered a considerable portion thereof. The testimony showed that water had gotten into the basement and extended as far as the elevator shaft and was approximately one or more inches deep therein.

Any inconsistencies in Mr. Irwin's testimony would go merely to his credibility and not to his competency. It is not difficult to believe that there could be $12,700 difference in the market value of a building of a value of over $250,000 immediately before and after the front wall of such building began leaking. Moreover, as stated in the case of Federal Underwriters Exchange v. Cost, 1938, 132 Tex. 299, 123 S.W.2d 332, 335, the function of an expert witness is to aid the court, and not to control it, on the determination of an issue.

Appellant's 30th point of error is to the effect that the trial court erred in holding that appellees were not contributorily negligent, as a matter of law, in maintaining their basement wall in a cracked and leaky condition. It is believed that such finding was justified under the evidence in the case. The drainpipe in question and the saturated soil were covered by the pavement in front of appellees' building. The mere fact that the sidewalk had subsided in places was not sufficient to put them upon notice as to what was occurring underneath the sidewalk, until the sidewalk was opened in 1952 and the condition was disclosed. The first indication of the south wall leaking at all was in June, 1951, approximately a year after appellant had done its work. Appellees immediately took steps to repair that situation and to stop the leak. At that time it was believed that the leaking resulted from natural moisture in the soil. When the leaks in 1952 became severe and water began seeping in large quantities into the basement, appellees took steps to remove all the sidewalk, and for the first time discovered the break in the drainpipe. They took immediate steps to remedy the same.

Appellant relies upon the cases of McKain v. Haynes, Tex.Civ.App., 203 S.W.2d 970, and St. Louis, Southwestern Ry. Co. of Texas v. Arey, 107 Tex. 366, 179 S.W. 860, L.R.A.1916B, 1065. These cases are distinguishable from the present case. In the Arey case the court held that the owner of premises maintained the same in a careless and negligent manner, leaving combustible material close to the railroad tracks where locomotives passed emitting sparks. The condition was open and could be observed by anyone. In McKain v. Haynes the building was a frame filling station housing highly inflammable material. The court held that a prudent man would be on notice of the dangerous condition and would take special precautions to prevent fire reaching his premises.

In the instant case there was no evidence that a cracked and leaky basement could be reasonably expected to result from the

construction of a gas pipeline laid by a gas company. Certainly the presence of the gas pipe underground did not constitute an inherently dangerous condition. Moreover, appellant's witness Hopfe stated that in his long experience he had never seen results of a nature produced as in this case.

■ Whether or not a plaintiff has exercised due care is ordinarily a question of fact for the jury. See Tidy Didy Wash v. Barnett, Tex.Civ.App., 246 S.W.2d 303, ref., n. r. e.

■ Appellant's 31st point of error is to the effect that the trial court erred in concluding that plaintiffs' cause of action was not barred by the two-year statute of limitations, Vernon's Ann.Civ.St. art. 5526. It is our opinion that this point of error is also without merit.

The case of Houston Water Works Company v. Kennedy, 70 Tex. 233, 8 S.W. 36, is not in point. In that case plaintiff sued for injuries to the walls of his building caused by settling and cracking as a result of the defendant committing a trespass upon plaintiff's property in cutting away a portion of the arch in the basement of plaintiff's building to make way through the same for defendant's water pipe. In such case the court stated, however, that if the original act was lawful the cause of action would not accrue until the injury was sustained.

In the present case the appellant had a right to lay its pipeline in the easement, and there was no evidence at the time that any wrong or trespass had been committed upon the property of appellees. The first indication that appellees had that the wall was leaking was in 1951, and the first time they knew of the condition under the pavement was in 1952. Even if limitation began running from June, 1951, when the first seeping occurred, the cause of action was not barred by the two-year statute of limitations since suit was filed on March 23, 1953.

See City of Houston v. Parr, 47 S.W. 393, in which this Court held that since the City had the right to construct a gutter, no right of action arose until the damage was actually sustained by the plaintiff. To like effect, see Wichita County Water Improvement District No. 1 v. Pearce, Tex.Civ. App., 59 S.W.2d 183; Beck v. American Rio Grande Land & Irrigation Co., Tex.Civ. App., 39 S.W.2d 640, writ ref.; Kolberg v. Hidalgo County Water Improvement Dist. No. 2, Tex.Civ.App., 110 S.W.2d 961.

■ The burden of proving limitation is on the defendant. 28 Tex.Jur., Limitation of Actions, Sec. 203. In the instant case appellant failed to show when the injury to appellees' property actually occurred or commenced, and failed to show that any trespass was committed. The failure of the appellant to properly backfill and tamp the trench after laying its pipeline was not a trespass. See Davies v. Texas Cent. Ry. Co., 62 Tex.Civ.App. 599, 133 S.W. 295; Ricker, Lee & Co. v. Shoemaker, 81 Tex. 22, 16 S.W. 645; Austin v. Cameron & Co., 83 Tex. 351, 18 S.W. 437.

Finding no reversible error in the judgment of the trial court, the same is affirmed.