**Gerald NATHAN et al., Appellants,**

v.

**William H. HUDSON, Appellee.**

No. 16311.

Court of Civil Appeals of Texas.

Dallas.

Feb. 21, 1964.

Rehearing Denied March 20, 1964.

Kilgore & Kilgore, William C. Garrett and Charles F. Hawkins, Dallas, for appellants.

Johnson, Bromberg, Leeds & Riggs and Otis B. Gary, Dallas, for appellee.

BATEMAN, Justice.

The appellants Gerald Nathan et al., beneficiaries under the last will of Max Cohen, sued the appellee William H. Hudson to recover substantial profits realized from the resale of certain corporate stock which he had purchased from Cohen's estate. Appellants alleged that the executors and trustees under Cohen's will breached their trust in selling the stock to appellee in that one of them, John A. McGuire, in the same transaction contracted to sell to appellee a large amount of his stock in the same corporation on a more favorable basis than that obtained for the estate. It was also alleged that appellee knew of this breach of trust

and participated in it. At the conclusion of a non-jury trial judgment was rendered that appellants taken nothing. We affirm.

By three points of error on appeal the appellants assert that the court erred in rendering judgment for appellee (1) upon the legal conclusion that appellee was a bona fide purchaser of the stock, (2) upon the legal conclusion that only the executors and trustees under Cohen's will could be held liable for the breach of trust, although appellee knowingly participated in it and profited thereby, and (3) because the breach of trust, appellee's participation therein and profits therefrom are all shown by stipulations, written agreements and other undisputed facts. These three points are so closely related that they will be considered together, as they were in the briefs of the parties.

Certain facts appear to be undisputed: Max J. Cohen died April 10, 1957 leaving a will in which John A. McGuire, Joseph P. Donohue and Felix Atwood were named independent executors and trustees. A principal asset of his estate was a large block of common stock in Three States Natural Gas Company. John A. McGuire became president of that company in 1951 and served as such until May 13, 1960, at which time his salary was $50,000 per year. He also served as a director of the company from 1951 until October 12, 1960. Cohen had been one of the original promoters of the company and had served it as a vice-president, general counsel and director.

Cohen had signed a promissory note in the principal sum of $1,236,340.45 payable to Byrd-Frost, Inc., the last installment of which, in the sum of $1,156,140.45 with accrued interest, was due on June 30, 1960. 1,136,590 shares of the common stock of Three States Natural Gas Company were pledged to secure the note, and the note provided that the maker would not be liable in any amount in excess of the value of the security thus pledged. Of the shares so pledged, half were owned by Cohen and

half by McGuire. Although the note was signed only by Cohen, McGuire acknowledged in his testimony that he owed half of the debt.

There were 6,500,000 shares of Three States common stock outstanding, of which the Cohen estate owned 624,415 shares and McGuire owned (with other members of his family) 683,544 shares. Both the estate and McGuire were in financial difficulty, principally because of their need to pay or refinance the balance which would soon be due on the note held by Byrd-Frost, Inc. In addition, the Cohen estate owed estate and inheritance taxes in the sum of $290,871, long past due, and it was doubtful if any further extension of time for paying same could be obtained.

Appellee was also a shareholder in the Three States company, owning approximately 150,000 shares, and had served as vice-president from April 24, 1957 until January 16, 1959, at which time he resigned because of disagreement between him and McGuire on various management problems. Through an intermediary the executors sought to interest appellee in purchasing the Three States stock owned by the Cohen estate. Discussions on this subject began in December 1959 and continued until March 19, 1960 when a meeting was held between McGuire, Donohue, appellee and the attorney for Three States. All of those at the meeting were attorneys except appellee. At that time the over-the-counter market price for one hundred share lots of the company's stock ranged from $2.875 to $3 bid per share. Hudson, the appellee, offered to pay $2.50 per share for the Cohen stock, but only on condition that McGuire would resign as president and would give Hudson a voting proxy on McGuire's 683,544 shares. McGuire did not desire to do either, but Hudson insisted because otherwise he could not be sure of control of the company and of implementing his plans for expanding the company's drilling program and increasing the value of its holdings. McGuire demurred because a sale of his stock would result in a large capital gain

tax, in addition to which his poor health caused him to fear that there might also soon be large estate taxes owing on his estate; also because he had a two million dollar investment in the company which he did not desire to risk under Hudson's program of management, in which he had less than complete confidence; also because the giving of a voting proxy on his stock would probably lower its collateral value for refinancing purposes. Moreover, to comply with Hudson's demands would require him to give up the $50,000 annual salary he was receiving as president.

After voicing all of these conflicting interests and ideas the parties entered into certain written agreements dated March 23, 1960, correctly summarized in appellants' brief as follows:

> "Stock Purchase Agreement dated March 23, 1960, between Max J. Cohen Estate and Hudson:
>
> "Hudson agreed to buy the Cohen Estate's 624,415 shares of Three States stock at $3.00 per share, one-half payable on May 16, 1960, and the other one-half payable on April 16, 1961, with 6% interest. Following May 16, 1960, Hudson would be entitled to vote on all questions all the Cohen shares so purchased including the one-half sold on credit. One-half of the shares was to be delivered on May 16, 1960, and the other half retained as security for the remaining payment.
>
> "Option Agreement dated March 23, 1960, between McGuire, personally, and Hudson:
>
> "1. McGuire obtained the option to require Hudson to purchase all or any part of the 683,544 shares of Three States owned by McGuire and his family at $3.00 per share from time to time and at any time during the period continuing to May 16, 1962, except that McGuire could not

require Hudson to purchase such stock at a rate faster than one-fourth of the total amount every thirty days.

> "2. McGuire obtained the right to have Hudson provide him a loan of over $588,000 at not more than 6% interest, such loan to remain in effect until May 16, 1962, for which McGuire would furnish as security only 539,562 of McGuire and family's 683,544 Three States shares.
>
> "3. McGuire obtained the right to have Hudson pay interest on the McGuire borrowings of over $588,000 referred to above in an amount proportionate to the number of shares that might be purchased by Hudson under the agreement, either as the result of McGuire's requiring such purchase at $3.00 per share or as a result of Hudson's requiring McGuire to sell at $6.00 per share.
>
> "4. McGuire reserved the right to sell all or any part of his and his family's 683,544 shares of Three States stock upon any terms he desired, to any other party, and upon such sale to take such shares completely out of the agreement. This meant that McGuire could, if he so elected, sell the shares free of any right of Hudson to vote such shares and free of all of the other terms of the agreement. Shares so sold would not thereafter have any of the benefit of the said agreement. To some extent McGuire was to apply some part of the proceeds of sales to relieve his debt.
>
> "5. Hudson received the right until May 16, 1962, to vote the 683,544 shares of Three States stock owned by McGuire and his family to the extent that such shares were not thereafter sold by McGuire and his family to other parties, but such

voting rights did not include the right to vote upon:

"(I) any merger or consolidation of the company;

"(II) any liquidation of the company;

"(III) any recapitalization of the company; or

"(IV) any proposed sale or all or substantially all of the assets of the company.

"6. Hudson received the right, until May 16, 1962, to require McGuire to sell all or any part of the 683,544 shares of Three States stock owned by McGuire and his family, or such part thereof as McGuire did not sell to others, at $6.00 per share.

"*Side Letter Agreement dated March 23, 1960, between McGuire, personally, and the Hudson brothers:*

"To further secure John McGuire with respect to the Option Agreement, the Hudson brothers agreed to keep unencumbered assets upon which $2,000,000 could be borrowed available in their personal accounts or trust accounts from May 16, 1960, to May 16, 1962."

These contracts were consummated on May 13, 1960, on which date McGuire executed his promissory note to the First National Bank in Dallas in the sum of $588,122.23, which was endorsed by appellee and his brother. McGuire also pledged as collateral security to this note 539,562 shares of Three States stock. Appellee caused his brother also to pledge certain of his securities valued at $100,000. The proceeds of that note, together with an equal amount of cash from the Cohen estate, were used to retire the Byrd-Frost, Inc. note, and the stock pledged thereunder was released. McGuire and Hudson disagreed as to which of them should pay the quarterly interest on McGuire's note to the First National

Bank in Dallas prior to the time of the exercise of either of the options for the purchase of McGuire's stock. McGuire threatened to withdraw from his agreement, telling Hudson to go forward with his purchase of the Cohen estate stock but to let him out of his obligations. Fearing that he was bound to purchase the estate's stock under his contract, and that he would then still lack control of the company if McGuire did not live up to his agreement, Hudson agreed to advance the interest, the ultimate liability for the interest to be determined in accordance with the original option agreement. McGuire resigned as president and Hudson was elected to replace him, McGuire being elected chairman of the board at a salary of $20,000 per year.

In July 1960, because of other commitments and interests, appellee became desirous of selling his stock in the Three States company, and soon thereafter received an offer to purchase his stock provided McGuire would sell his stock on the same basis. McGuire first declined but later, at Hudson's urging, consented to do so, but on the basis that the sale would be treated as if Hudson were exercising his option to purchase McGuire's stock in accordance with the option agreement, to which Hudson agreed although it resulted in his being liable for approximately $11,000 of interest on McGuire's note to the First National Bank. All of Hudson's stock (including the 624,415 shares he had purchased from the Cohen estate) and all of McGuire's stock were then sold at $3.50 per share and the option agreement released. Thus appellee Hudson made a profit of fifty cents per share on the 624,415 shares he bought from the estate, or $312,207.50, and appellants, having an 80 percent beneficial interest in the estate, sue for 80 percent of Hudson's total gain, or $249,766.

Appellants remind us of the well settled principles of law, that equity demands of a fiduciary the highest duty of loyalty and undertakes to enforce such duty by "prohibiting him from using the advantage of

his position to gain any benefit for himself at the expense of his *cestui que trust* and from placing himself in any position where his self-interest will or may conflict with his obligations as trustee." Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377, 388. Our attention is also directed to this excerpt from the opinion of the Supreme Court in Nabours v. McCord, 100 Tex. 456, 100 S.W. 1152, 1154:

> "It does not matter that a greater sum could not have been procured at that time from other parties, for the self-interest of the trustee in the transaction was such a vice as 'leaveneth the whole lump' and renders the transaction voidable at the election of the *cestui que trust* without looking further into the matter than to ascertain that the interest existed."

Appellants argue that they are entitled to recoup the profits made by appellee because the extension of credit by appellee to McGuire individually, being made simultaneously with the extension of credit by the estate to Hudson on his purchase of the Cohen stock, was tantamount to McGuire's circuitously obtaining credit from the estate of which he was an executor and trustee. They also argue that the effect of the option agreement between Hudson and McGuire was to guarantee McGuire a minimum of $3 per share, with the possibility that he might obtain as much as $6 per share, while the estate was compelled to sell its stock at only $3 per share, and that this, coupled with Hudson's agreement to pay the interest on McGuire's note to the First National Bank under certain conditions, in effect constituted a bribe paid by Hudson to induce McGuire, as executor and trustee, to cause the estate to sell the stock to Hudson at the price agreed upon. Appellants also point out that they were never apprised of the negotiations or agreements, or given any opportunity to object. Because of his own personal interest in the entire transaction, appellants say, McGuire breached the trust imposed upon him by Cohen's will, citing Murphy-Bolanz Land &

Loan Co. v. McKibben (Tex.Com.App.), 236 S.W. 78.

They also argue that, since it clearly appears from the undisputed facts and stipulations that Hudson knew he was dealing with McGuire as an executor of the Cohen estate as well as in his personal capacity, being a party to all of the agreements of March 23, 1960, he must be held to have participated in the breach of trust by McGuire, and is therefore liable to the beneficiaries of the Cohen estate under the authority of Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565, 160 S.W.2d 509, 514, wherein it is said:

> "It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."

■ While we are in complete agreement with the decisions so cited by appellants, we are not persuaded that the law so pronounced is applicable to the facts of this case. In the first place, the burden of proof rested upon appellants to show that Hudson was not an innocent purchaser of the Cohen stock. Old National Life Ins. Co. v. Guest, Tex.Civ.App., 163 S.W.2d 241, err. ref. w. o. m. The trial judge filed findings of fact and conclusions of law, wherein he concluded that appellants had not met this burden and that appellee "did not knowingly participate in any breach of duty toward the estate of Max J. Cohen and is not liable to plaintiffs," also that appellee was a bona fide purchaser of the Cohen stock, "for value and without notice, actual or constructive, of any breach of duty toward the Estate of Max J. Cohen." The court specifically found that appellee would not have purchased the Cohen stock unless McGuire had agreed to resign as president of Three States Natural Gas Company and to give appellee the voting proxy on his shares; that McGuire received the option and assistance in refinancing his part of the debt to Byrd-Frost, Inc. from Hudson in

exchange for his resignation as president of the company and giving Hudson the voting proxy on McGuire's shares; that appellee was innocent of any breach of trust and was not negligent in entering into the March 23, 1960 agreements, but acted as an ordinarily prudent businessman would have acted under the same circumstances.

■ The trial court's findings of fact and conclusions of law should be construed together and, if possible, to be in harmony with the judgment and to support it; and in determining whether the findings are supported by any evidence of probative value we should give credence only to the evidence favorable to the findings, disregarding all evidence to the contrary. Brown v. Frontier Theatres, Inc. (Tex. Sup.), 369 S.W.2d 299, 301.

■ Appellants offered no objections or exceptions to any of the findings of fact or conclusions of law. Having the same force and effect as jury findings, they are binding on this court and will not be disturbed if supported by some evidence of probative value; and in determining whether there is evidence to support such findings, we must indulge every legitimate conclusion favorable thereto. A. J. Rife Construction Co. v. Brans, Tex.Civ.App., 298 S.W.2d 254, 257, err. ref. n. r. e.; Banks v. Crawford, Tex. Civ.App., 330 S.W.2d 243, err. ref. n. r. e.; Houston Natural Gas Corp. v. Pearce, Tex. Civ.App., 311 S.W.2d 899, 903, err. ref. n. r. e.; Dixie Distributors v. Lane, Tex. Civ.App., 211 S.W.2d 581, 584, err. ref. n. r. e.

■■ Applying these well settled principles of law to the record before us we find there is ample evidence to support the findings and conclusions of the trial court. Appellants not having requested additional or amended findings and conclusions, as authorized by Rule 298, Texas Rules of Civil Procedure and since they do not in their points of error or elsewhere in their brief assert any lack of evidence to support the findings and conclusions, such findings and conclusions must be accepted by us. Rule 299, T.R.C.P.; Curry v. E. E. Stone Lumber Co., Tex.Civ.App., 218 S.W.2d 293, err. ref. n. r. e.

It is quite evident from this record that Hudson did not seek out McGuire or either of the other two executors of the Cohen estate and offer him or them any inducement whatever to sell the Cohen stock to him. To the contrary, the estate was in great need of cash to pay at least two large and very pressing obligations. Its time for paying those debts was fast expiring, and its representatives sought out Hudson in the hope that he might be induced to buy the estate stock. Hudson made it clear that he would be interested in doing so only if he could obtain what was called "working control" of the corporation and displace McGuire as president and thus be in position to operate the company according to his own ideas and plans. It is also quite obvious from the record as a whole that McGuire did not feel that he was being bribed to sell the estate stock to Hudson because on one occasion he tried to get out of his part of the agreement and let Hudson buy the Cohen stock at the agreed price, but Hudson, being still unwilling to purchase the Cohen stock unless he could displace McGuire as president and get control of the company, declined to release McGuire.

■ It is true the court found that McGuire did receive a more valuable agreement as to his shares of stock than did the Cohen estate, although the court also found that this was a sharply disputed issue of fact.[1] The finding that McGuire received

---

1. Each side tendered an expert witness, one expressing the opinion that McGuire received a better deal than the estate, and the other testifying that in his opinion the agreements left the estate in "infinitely the better position." One of these witnesses said that he and his staff spent approximately thirty days on this evaluation question, and the other that he had spent approximately one hundred hours in arriving at his opinion.

the better deal is of course also binding on us, but we do not consider it in any sense controlling in the light of the other findings and conclusions. The two "deals" were quite different and in our opinion it would be next to impossible for anyone to say definitively that one was more valuable than the other. Such a comparison would be fairly futile from another viewpoint; viz., the executors had no authority under the will to grant Hudson a voting proxy on the Cohen stock, as McGuire did with respect to his individual stock. Moreover, assuming that it would have been lawful for the executors to make the same agreement with Hudson with respect to the Cohen stock as McGuire made with respect to his own stock (which we do not find it necessary to decide, but concerning which we think there is great doubt), such an arrangement or agreement would not have solved the problem urgently facing the estate; viz., the need, not only of refinancing the amount due on the Byrd-Frost note, but also that of raising another $290,000 for federal estate taxes; and if the estate and Hudson had "traded options" as McGuire and Hudson did, and if Hudson had been unable or unwilling to respond to an immediate exercise of the option the estate would not have had sufficient funds with which to pay the estate tax liability and would have been subject to foreclosure of the government's lien on all of its assets. As it was, the estate received sufficient consideration for its shares to enable it to meet its pressing obligations, and also received what the trial court found to have been "a fair price for the stock and * * * the best price obtainable." "There must be no speculation upon the part of the trustee in dealing with the trust fund. The law does not give to him the same freedom of choice in making investments which may be and often is exercised by prudent business-men in the conduct of their own affairs." Murphy-Bolanz Land & Loan Co. v. McKibben (Tex.Com.App.), 236 S.W. 78, 80.

We are unable to say from the record as a whole that the trial court erred in its conclusion that appellee was an innocent purchaser for value and without notice of any breach of duty on the part of any of the executors of that estate. We find in the record no evidence of *mala fides* on the part of appellee.

We are not called upon to make any determination as to whether McGuire or either of the other executors of the Cohen estate breached or did not breach his or their trust, and we make no such determination. We do find that the appellants have failed to meet the burden of showing reversible error in this case, and the judgment is accordingly affirmed.

Affirmed.